## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| ELLEN ABDUR-RAHIM, *et al.*, | ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 2:17-cv-00601 |
| v. | ) ) | |
| THE CITY OF COLUMBUS, *et al.*, | ) ) ) | Judge: Edmund Sargus |
| Defendants. | ) ) ) | Magistrate Judge: Chelsey Vascura |

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs file this Motion for Partial Summary Judgment pursuant to Fed. R. Civ. P. 56. Specifically, Plaintiffs move this Court for summary judgment against the two individual Defendants, Columbus Police Officers Justin Masters and John Thiel, in their official and individual capacities, on plaintiffs' claims under the Fourth Amendment of the U.S. Constitution for the use of excessive force, and under state law for the torts of assault and battery. As to these claims, no material fact is in dispute and Plaintiffs are entitled to judgment as a matter of law. A Brief in Support is attached to this Motion.

Respectfully submitted,

July 15, 2019

*/s/ Elizabeth Bonham*
Elizabeth Bonham (0093733)
Freda J. Levenson (0045916)
ACLU of Ohio Foundation, Inc.
4506 Chester Avenue
Cleveland, Ohio 44103
Tel: (216) 472-2220
Fax: (216) 472-2210
ebonham@acluohio.org
flevenson@acluohio.org

David J. Carey (0088787)
ACLU of Ohio Foundation
1108 City Park Ave., Ste. 203
Columbus, OH 43206
Tel: (614) 586-1972 x2004
Fax: (614) 586-1974
dcarey@acluohio.org

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| ELLEN ABDUR-RAHIM, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 2:17-cv-00601 |
| v. | ) ) | |
| THE CITY OF COLUMBUS, *et al.*, | ) ) ) | Judge: Edmund Sargus |
| Defendants. | ) ) ) | Magistrate Judge: Chelsey Vascura |

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### INTRODUCTION

On January 30, 2017, in response to President Trump's Executive Order 13769, a Travel Ban prohibiting people from seven Muslim-majority countries from reentering the U.S., political demonstrations erupted across the country. In Columbus that evening, a group of peaceful protesters including Plaintiffs gathered outside the Ohio Statehouse to express their solidarity with Muslim and immigrant communities and their dissent to the Travel Ban. The Demonstration, called "Rally for the 99%," drew hundreds of Columbus-area people—families with children, members of religious communities, immigrants, students, and others—to rally together and express their political views.

Beginning in the early evening, people gathered to make speeches and sing protest songs on and around the Statehouse lawn. The group diminished in size over the course of the evening as some returned home, and around 8:00 p.m. a smaller group of about 100 remained at the intersection of E. State and S. High. The group sang, prayed, chanted, and held signs to express opposition to the President's actions.

Prior to the event, the Columbus Police Department had surveilled the prospective attendees' social media feeds, and had prepared an Incident Action Plan. Pursuant to the plan, the Department

1

dispatched over two hundred officers in riot gear armed with shields and weapons including pepper-spray canisters of multiple sizes. Officers appeared in cars and SUVs, on bicycles, and on foot, and still more officers were on call nearby. The Department even dispatched a Long Range Acoustic Device (LRAD)— a military weapon also known as a sound cannon. The police partially shut down the area to traffic early in the evening, and by 8:00 had formed a line facing the Demonstration, completely blocking off S. High Street from the south. One police cruiser sporadically issued orders to leave the area.

The front line of about 12 police officers put on gas masks and pulled out large, special-issue canisters of pepper spray. At about 9:00 p.m., after an order from their commanding lieutenant, they shot the pepper spray in orange streams over the group, some of whom were only steps away and caught the chemical streams in their eyes and mouths. As the demonstrators, coughing and choking on the chemical spray, had turned and were leaving the area, police officers followed them, targeting Plaintiffs and other individuals for further abuse. Officer Justin Masters followed Plaintiff Ellen Abdur-Rahim while she retreated from the intersection, grabbed and held her, and pepper-sprayed her directly in the eyes at less than an arm's length. Officer John Thiel followed Plaintiff Harrison Kallner as he tried to leave the area, and pepper-sprayed Harrison in the face and eyes from a few feet away.

Neither Plaintiffs, nor any other demonstrator, was armed, violent, resistant, threatening, or even noncompliant—they were *in the act of dispersing* when the officers targeted them individually. In fact, no arrests were made or persons charged with any crime at all that night. After targeting and attacking Plaintiffs, the officers recorded themselves with their own body cams, celebrating the infliction of pain, for example saying of Ellen, "I wanted that chick to get it, and she got it," and "she got it good." The police officers' actions were gratuitous and malicious displays of unlawful force.

This Motion for Partial Summary Judgment asks the Court to find that as to Plaintiffs' Fourth Amendment excessive force claims and their state law assault and battery claims against Officers Masters

and Thiel, there is no genuine dispute of any material fact and Plaintiffs are entitled to judgment as a matter of law. When Officer Masters pursued and assaulted Ellen, and Officer Thiel assaulted Harrison, it was clearly established that pepper-spraying a compliant, nonviolent political demonstrator in the eyes was unconstitutional and tortious abuse. Plaintiffs will prove their First Amendment, supervisory liability, and *Monell* claims at trial.

## STATEMENT OF UNDISPUTED FACTS[1]

### A. The January 30, 2017 Demonstration

On January 30, 2017, in response to President Trump's Travel Ban, large First Amendment demonstrations took place across the nation in support of immigrant and Muslim communities. The subject of this litigation is the protest that occurred that evening at and around the Ohio Statehouse, "Rally for the 99%" ("the Demonstration"). ECF No. 31 (Third Am. Compl.) at 16; ECF No. 33 (Answer to Third Am. Compl.) at 16. The Demonstration was open to the public and attended by a large and diverse group of people. Families with children, students, immigrants, and other Columbus residents attended, all to demonstrate their dissent against the Travel Ban. Deposition of Justin Masters ("Masters Dep.") at 156:5-12; Deposition of Ellen Abdur-Rahim ("Abdur-Rahim Dep.") 65:2-24. Video and audio footage of much of the Demonstration was captured on police body camera video and on video taken by demonstrators and bystanders. *See* Demonstrative Video Exhibits ("Vid. Ex.") 1, 2, 3, and 4; After Incident Report of Jeffery Lipp, attached as Exhibit 1.

Defendant the Columbus Police Department became aware of the Demonstration days before it

---

[1] This statement of undisputed facts demonstrates the individual Defendants' liability as to Plaintiffs' state and constitutional excessive force claims. At trial, Plaintiffs will introduce additional facts to show that Defendants' conduct was in retaliation against their First-Amendment protected speech; that Lieutenant Lipp is liable for failing to stop these violations; and that each of these violations resulted from the official-capacity Defendants' custom and policy of suppressing protest speech by force in Columbus.

occurred by surveilling the social media feeds of local activists, including those who planned and shared news of the demonstration. ECF 31 at 19; ECF 33 at 19; Ex. 1. The Police Department created an Incident Action Plan detailing how the police would staff and patrol the event. Incident Action Plan, attached as Exhibit 2. The Plan provided for the use of force against peaceful demonstrators, including the use of chemical mace or pepper spray. *Id.* Also pursuant to the Plan, the police assigned to the event were equipped both with standard-issue and higher-grade mace. *Id;* Masters Dep. 112:2-114:1; *see also* Deposition of John Thiel ("Thiel Dep."). 48:8-49:19.

Defendant-Officers Justin Masters and John Thiel of the Columbus Police Department were on duty from the beginning of that evening and stood by as people began arriving at the Demonstration. Masters Dep. 106:4-110:20; Thiel Dep. 55:6-57:22.

Plaintiff Ellen Abdur-Rahim arrived at a little past 6:00 p.m. with several of her friends and gathered near the Statehouse steps. Abdur-Rahim Dep. 45:21-46:23. She joined the group of peaceful demonstrators in chanting and singing protest songs. *Id.* at 54:14-60:4. Plaintiff Harrison Kallner, then a Columbus area high school student, also arrived at the Demonstration around 6:00 p.m. with two friends, and also gathered with others near the Statehouse. Deposition of Harrison Kallner ("Kallner Dep.") 21:2-22:4.

Between 6:00 and 7:30 p.m., the group, then comprising several hundred individuals including Plaintiffs, remained near the Statehouse, peacefully standing, speaking, praying, chanting, and holding protest signs. Kallner Dep. at 28:4-19; Masters Dep. 124:16-125:3. At about 7:30 p.m., the group began a planned march from the corner of S. High Street and E. State Street, moving southward on S. High Street on the eastern sidewalk. Kallner Dep. 29:16-31:5. Police officers including Officers Masters and Thiel were stationed all around, and began to follow protestors on bicycles, in cars, and on foot, during the march. Thiel Dep. 73:1-75:5; Masters Dep. 119:14-125:3. The demonstrators marched to the Franklin

4

County Courthouse, where they stopped. *Id*. There, they continued to pray, chant, and sing for about fifteen minutes before heading back north the way they had come, again using the eastern sidewalk along S. High. Abdur-Rahim Dep. 53:18-54:24.

As the evening progressed, the group dwindled. Abdur-Rahim Dep. 54:14-24; Kallner Dep. 35:24-36:6. After the march, a smaller group of fewer than 100 gathered back near the Statehouse, assembling in the street at the intersection of E. State and S. High. *Id.* Pursuant to an order by Defendant Lieutenant Jeffrey Lipp, the police officers including Officers Masters and Thiel converged to form a police line facing the smaller group of demonstrators from directly south of the assembly. Abdur-Rahim Dep. 55:1-56:10; Masters Dep. 122:2-123:15 and 127:4-13; Thiel Dep. 76:4-77:6. The police and the small group of demonstrators faced one another, with the police line and rows of police vehicles entirely blocking off S. High just south of E. State. *Id.*

Between 8:15 and 9:00 p.m., the police remained stationed there, and periodically issued orders from one of their vehicles instructing the demonstrators to leave the area or move out of the street. *See* Ex. 1. The demonstrators also remained, and continued to sing, pray, and speak their messages of dissent, including periodically speaking individually with police officers. Kallner Dep. 36:16-37:6; Abdur-Rahim Dep. 58:6-60:11. For this approximately 45-minute period, the police took no action against the demonstrators except to stand in line and sporadically issue a verbal order to leave the street or area. Similarly, the demonstrators did not change their behavior—they continued to sing, chant, and speak peacefully, at one point kneeling in prayer. *Id.* Many of the protestors said that they could not hear any order to leave the area. Kallner Dep. 37:23-38:12; *see also* Masters Dep. 137:13-15. The demonstrators neither committed nor threatened violence at any time. *See* Masters Dep. 124:16-125:3 ("There was no violence or anything") and 157:14-24 ("Yeah, it was peaceful. There was no violence."); Ex. 1.

After 8:30 p.m., officers in the police line closest to the demonstrators put on gas masks and

revealed the canisters of military-grade pepper spray that they had been issued for use that night. Masters Dep. 160:14-20; Kallner Dep. 42:24-43:18. The demonstrators near the front of the group could see that the police had taken out these weapons. Abdur-Rahim Dep. 67:2-68:20. Approximately 30 minutes later, Lieutenant Lipp went to the front of the police line and commanded the officers carrying pepper spray, including Officers Masters and Thiel, to deploy pepper spray over the heads of the demonstrators. *See* Vid. Ex. 1.*; Ex. 1; *see also* ECF No. 63 (Defendants' Motion for Summary Judgment) at 15.

Less than four minutes later, all twelve police officers including Officers Masters and Thiel shook their canisters and sprayed streams of the chemical at the group, the closest members of which were less than 10 feet away. Thiel Dep. 80:4-81:23 and 82:12-83:8; Masters Dep. 151:3-16 and 162:23-163:24 Abdur-Rahim Dep. 72:6-24; Photographic Exhibit A. ("Photo Ex. A"). Gasping for air, choking, and coughing, all demonstrators, including Plaintiffs, turned and immediately began to disperse from the area. Vid. Ex. 1, 2, and 3; Photo Ex. C.

Two types of pepper-spray canisters were used to attack the group: some officers used hand-sized canisters of standard-issue mace, and some also used a larger, more powerful canister typically available only to commanding officers. Ex. 2; Masters Dep. 112:2-114:1; Thiel Dep. 48:8-49:19. This latter type, a military-style spray can, is tightly controlled and typically kept secured in the trunks of lieutenants' vehicles; Lieutenant Lipp and others equipped the officers with it to use on the demonstrators that night. *Id.;* ECF No. 63 at 13 (the larger canisters "could cover a larger area" and have triple the capacity); *see also* Police Record of Pepper Spray Details, attached as Exhibit 3. According to police records this chemical can cause violent coughing, dizziness, and unconsciousness, among other symptoms. *Id.*

Over the entire duration of the Demonstration, no participant ever made a verbal or physical threat or engaged in violence or other harm towards people or property. No one was arrested, detained, or charged for any crime in connection with the Demonstration. Ex. 1. No demonstrator had or was alleged

to have a weapon or threaten harm to themselves, officers, or others. Masters Dep. 124:16-125:3 ("There was no violence or anything") and 157:14-24 ("Yeah, it was peaceful. There was no violence"); Deposition of Aaron McDonald ("McDonald Dep.") 81:13-24. Defendants cannot and do not contend otherwise. *See* ECF No. 63 at 9 (the situation, though "awkward," was "non-violent"). The Demonstration—apart from the police's behavior—was peaceful.

## B. Columbus Police Officers' Gratuitous and Unlawful Attack on Individual Demonstrators

After the police deployed their initial rounds of pepper spray at the group, and while the demonstrators were dispersing, police still armed with pepper spray targeted and followed individual demonstrators, including Plaintiffs, to attack them further. Photo Ex. B. Masters Dep. 185:11-188:11; Thiel Dep. 83:16-86:7. Officers Masters and Thiel intentionally sprayed Plaintiffs Ellen Abdur-Rahim and Harrison Kallner—while they were dispersing—at close range and directly into their eyes. *Id.* After these attacks, on-duty officers mocked and celebrated the damage they had inflicted, including saying of Ellen, "I wanted that chick to get it, and she got it…she got it good." ECF No. 31 at 55-56; ECF No. 33 at 45-46.

### i.    Defendant Officer Thiel's Attack on Plaintiff Harrison Kallner

Harrison Kallner, then a high school student, had arrived at the Demonstration that evening with friends to peacefully show opposition to President Trump's Travel Ban. Kallner Dep. 21:2-22:4; 24:6-20. Harrison, who is an artist, also wanted to take photographs to document the Demonstration. *Id.* 42:5-22. At 9:04 P.M., when the police deployed their first round of pepper spray at the demonstrators, he was standing on top of a trash can on the sidewalk along the southwest corner of State and S. High streets. *Id.* 40:9-41:12. He had been standing at that vantage point for at least 45 minutes, joining in the singing and chanting of the group. He was holding a protest sign that read "resist / I will not be represented by fascism, bigotry, or white supremacy." *Id.; see also* 22:15-23:3. From where he was, Harrison could not hear any

of the police dispersal orders. *Id.* 37:22-38:12. When suddenly the police opened their initial chemical spray over the group, it frightened and then immediately hit him, and he jumped down from the trash can and began to disperse from the area. *Id.* 44:1-45:11 and 55:1-7.

Harrison began to disperse by moving north away from the group, as the police line was blocking all access to the south. *Id.*; *See also* ECF No. 63 at 7 (police line was to the south of the protesters), 12 (Harrison moved away towards the northeast). As he tried to comply with the police order to clear the area, and already incapacitated from inhaling the first deployment of pepper spray, he heard police following him. He turned to Officer Thiel, who was following close behind; held both hands out in a helpless gesture, and asked the officer, "Why are you fucking spraying us?" Kallner Dep. 44:19-20, 46:1-11, and 72:8-73:22. In response to this question Officer Thiel held up his canister of pepper spray and sprayed Harrison directly in the eyes from only a few feet away. Vid. Ex. 3; Def. Suppl. Resp. to Pl.'s 2nd Set Interrog. attached as Exhibit 5; Kallner Dep. 49:11-50:3; Thiel Dep. 137:18-24; 142:4-22; 146:2-147:22; 149:5-151:2. Officer Thiel admits, as he must, that the attack was intentional. *Id., see also* ECF No. 63 at 13-14 (Officer Thiel intentionally sprayed Harrison).

Thiel's close-range attack caused Harrison intense pain and momentary blindness. He stumbled to a nearby sidewalk and fell down. Kallner Dep. 49:11-50:3; Photo Ex. D; Vid. Ex. 4. Several other demonstrators, including Harrison's friends who had not been as incapacitated by pepper spray, attempted to help by pulling off Harrison's damaged clothes and flushing his eyes with water. Vid. Ex. 4. One woman did what she could, and assisted by expressing her breast milk to soothe Harrison's eyes, since milk is a treatment for chemical injuries. Kallner Dep. 51:1-53:9. Police made no effort to administer any medical help. Thiel Dep. 95:15-24. When Harrison tried to seek professional emergency assistance, the Columbus emergency medical team who did arrive was not equipped to treat chemical injuries and could not help. Kallner Dep. 51:1-55:22. Harrison's physical injuries were agonizing: "it got in my eyes, in my mouth

8

and it was in my throat like burning. I couldn't really breathe…I just felt like my eyes were dissolving and like my whole body was on fire." Kallner Dep. 75:21-76:18. He also now fears future attacks by the police and as a result is dissuaded from participating in other political actions. *Id.* 74:23-75:20 and 59:10-62:12.

### ii. Defendant Officer Masters' Attack on Plaintiff Ellen Abdur-Rahim

Ellen Abdur-Rahim had joined the Demonstration with her friends, and helped to lead and speak to fellow demonstrators throughout the event. Abdur-Rahim Dep. 45:21-46:23. At 9:04, when the police line unleashed its first deployment of pepper spray against the group, Ellen was near the front and center of the group in the street, very close to the police line. *Id.* 72:11-76:17; Photo Ex. C. From her vantage point near the front, she had seen police don their riot masks and take out pepper-spray canisters, and she had stepped close to attempt to ask them not to use force against the high school-aged children among the group. *Id.* Because of her place close to the initial deployment of pepper spray, Ellen was severely affected. *Id.* The first deployment left her bent over and choking, with the chemical in her eyes and mouth. *Id.* Though she had to struggle in order to move at all, she tried to disperse by running northwest towards the sidewalk, away from the police blockade. *Id.*; Photo Ex. C; *see also* ECF No. 63 at 14 & Ex. V (citing a photograph that Defendants agree shows Ellen moving "westward and northward" away from the blockade); *id.* at 15 ("After the initial deployment of mace … Abdur-Rahim has moved somewhat to her northwest").

As Ellen was dispersing, Officer Masters and another officer, Scott Wright, approached her from behind. Abdur-Rahim Dep. 75:19-76:17; 90:15-24. Officer Wright sprayed her with pepper spray at close range, then continued on to attack another demonstrator nearby. Officer Masters then grabbed her by the shoulder, extended his arm towards her face, and pepper-sprayed her directly in the eyes at point blank range. Vid. Ex. 1, 2. Officer Masters admits that his attack on her was intentional. Masters Dep.170:4-

188:22*; Def. Corr. Resp. to Pl.'s 1st Set Interrog., attached as Exhibit 4; *see also* ECF No. 63 at 18-19.

As a result of the attack, Ellen experienced excruciating physical pain. Abdur-Rahim Dep. 77:3-83:5; 84:6-85:18; 86:2-87:22. The chemical caused her contact lenses to fuse to her eyes, trapping the chemical against her eyes. *Id.* She attempted to seek medical treatment from the Columbus emergency medical providers who responded to the attacks, but she could not get relief because they were not equipped to treat chemical injuries. *Id.* 84:6-21. Ellen's body experienced shock that took hours to subside. In addition to the effects that the spray had on her exposed skin, the chemical soaked into her clothes causing burns all over her body. *Id.* Ellen's friends transported her to a volunteer medic's home, where he helped her to wash with cold water and dish soap. *Id.* 84:17-89:17. Besides the physical pain and suffering she experienced, Ellen experienced significant emotional trauma from the police interaction. *Id.* 94:24-96:13. ("When I think about the incident I still hear footsteps of the officer…I can still feel the body heat of the officer that directly pepper sprayed me in my eye and caused me to burn for hours, even in my genitalia and my hair, on my lips, in my nose, everywhere…Besides the physical pain, it has mentally scarred me.")

## LAW AND ARGUMENT

### A. Plaintiffs Are Entitled To Judgment As A Matter of Law On Their Constitutional Excessive Force Claims Against The Individual Police Officers.

When police use chemical weapons to subdue or control the movement of a free person, they seize that person within the meaning of the Fourth Amendment. *See Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009); *see also Ciminillo v. Streicher,* 434 F.3d 461, 464-5 (6th Cir. 2006); *California v. Hodari D.,* 499 U.S. 621, 626 (1991). Police violate the Fourth Amendment right to be free from excessive force unless the force is "objectively reasonable" under the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989).

The *Graham* examination requires balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests." *Id.* at 396. The key factors (but not the only factors) relevant to the *Graham* analysis are "1)  the severity of the crime at issue, 2) whether the suspect poses an immediate threat to the safety of the officers or others, and 3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.; see also Martin v. City of Broadview Heights,* 712 F.3d 951, 958 (6th Cir. 2013). When applying the *Graham* analysis to an event with multiple uses of force, each use of force is evaluated as its own independent constitutional violation. *E.g. Gaddis ex rel. Gaddis v. Redford Tp.,* 364 F.3d 763, 772 (6th Cir. 2004). The *Graham* factors and the circumstances as a whole here leave no doubt that Officers Masters' and Thiel's attacks against Plaintiffs were unconstitutional force in violation of clearly established law.

### i. Pepper-spraying nonviolent, nonthreatening individuals in any circumstances is excessive force in violation of clearly established law.

Longstanding, clearly established law in this Circuit provides that police use of pepper spray against nonviolent, nonthreatening, or nonresistant free people is an unlawful use of force under the Fourth Amendment's objective reasonableness standard. *Adams v. Metiva*, 31 F.3d 375, 385 (6th Cir. 1994); *Atkins v. Township of Flint*, 94 F. App'x. 342, 349 (6th Cir. 2004); *Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009).

In *Grawey,* police pepper-sprayed the plaintiff when his "crime, disturbing the peace, was relatively minor," when he "was unarmed" and "did not pose an immediate threat to the officers or to others," and when he "was not actively resisting arrest or trying to flee." *Id.* at 311. The Court denied the officer's qualified-immunity claim, noting this Circuit has found the use of force as extreme as pepper spray to be acceptable only when an armed or dangerous subject is being taken into custody and resisting arrest. *Id.*

Under *Grawey,* even when a suspect of a crime verbally or physically resists arrest, the use of pepper spray is excessive force if the person is not armed or violent. *Grawey,* 567 F.3d at 311; *Greene v. Barber,* 310 F.3d 889, 898 (6th Cir. 2002) (pepper spray was excessive even where arrestee was physically resisting arrest); *Vaughn v. City of Lebanon,* 18 F. App'x. 252, 265-6 (6th Cir. 2001) (use of pepper spray may have been excessive against "drunk and disorderly" arrestee). When someone is already incapacitated, use of pepper spray at all is clearly established to be unconstitutional. *Champion v. Outlook Nashville, Inc.* 380 F.3d 893, 902-3 (6th Cir. 2004) (denying qualified immunity; use of pepper spray against a handcuffed arrestee was excessive; discussing effects of pepper spray); *see also Cabaniss v. City of Riverside,* 231 F. App'x. 407, 413 (6th Cir. 2007). Indeed, "there is a very limited class of circumstances where the use of pepper spray *is* proper." *Cabaniss,* 231 F. App'x. at 413.

This Circuit considers pepper spray to be an excessive use of force where "the plaintiff was not actively resisting arrest, had not been informed he was under arrest, or could no longer be perceived as a threat to the officers or others[;]" "where an individual is guilty of only a minor violation even if that individual was actively resisting arrest[;]" "where a detainee has surrendered or is secured, is not acting violently, and does not pose a threat to officers or third parties[;]" or when someone "has not been told they are under arrest and is not resisting." *White v. Greene County Sheriff's Dept.* No. 2:09-cv-211, 2014 WL 3058393 at *5 (E.D. Tenn. Jul. 2, 2014) (collecting cases). Finally, use of force similar to pepper spray, including TASERs, is clearly established to be excessive when a person is "non-resistant" and not under arrest. *Kijowski v. City of Niles,* 372 F. App'x. 595, 601 (6th Cir. 2010); *Saunders v. Cuyahoga Metro. Hous. Auth.*, No. 18-3119, 2019 WL 1777223, at *6 (6th Cir. Apr. 23, 2019).

Here, police targeted, followed, and pepper-sprayed Plaintiffs while they were <u>already</u> following a police order to leave the area, and incapacitated from the police's initial spraying of the group. At no time had any of the protestors been armed, dangerous, or under arrest. None of the circumstances support

12

any use of force at all, let alone force as extreme as a chemical weapon used against compliant people who were already injured.

ii.     **Pepper spaying nonviolent, nonthreatening political demonstrators attempting to comply with a police order is excessive force in violation of clearly established law.**

In addition to this Circuit's clear law on use of pepper spray against free, compliant people, the weight of authority from this and other circuits shows this principle applies even more stringently when law enforcement uses weapons against peaceful <u>political</u> demonstrations. In the context of use of force against nonviolent political demonstrators, "[w]here activities protected under the First Amendment are involved, the requirements of the Fourth Amendment must be applied with scrupulous exactitude." *Lamb v. City of Decatur,* 947 F.Supp. 1261, 1263 (C.D. Ill. 1996) (internal citations and quotation marks omitted); *see also Bray v. Planned Parenthood Columbia-Willamette Inc.,* 746 F.3d 229, 236 (6th Cir. 2014) ("the Fourth Amendment originated, in part, as a safeguard for free speech," collecting cases).

Courts addressing the use of pepper spray or similar force at political protests from the Vietnam War opposition to Occupy Wall Street have found unconstitutional force when demonstrators are attacked without posing any threat, even when they are not currently engaged in protected speech. *See Lamb,* 947 F.Supp. at 1265 (denying qualified immunity to police who pepper-sprayed peaceful labor organizers; "What value would the First Amendment carry if its demonstrators could be dispersed or intimidated by police brutality or unnecessary force?"); *Headwaters Forest Defense v. County of Humboldt,* 276 F.3d 1125, 1129-30 (9th Cir. 2002) (denying qualified immunity, finding use of pepper spray on nonviolent peaceful protestors to force them to move was excessive force); *Headwaters Forest Defense v. Cnty. of Humboldt,* 240 F.3d 1185, 1203 (9th Cir.2000) *vacated on other grounds by* 534 U.S. 801, 122 S.Ct. 24, 151 L.Ed.2d 1 (2001), *affirmed on remand in* 276 F.3d 1125 (2002) (same); *Buck v. City of Albuquerque,* 549 F.3d 1269, 1289-90 (10th Cir. 2008) (denying qualified immunity, finding excessive force and supervisory liability when officers shot nonviolent political demonstrators with tear gas and pepperballs);

13

*Fogerty v. Gallagos,* 523 F.3d 1147, 1160-61 (10th Cir. 2008) (denying qualified immunity, finding excessive force and supervisory liability when officers attacked nonviolent student demonstrator with tear gas while he was kneeling on library steps; also considering "that the police may have contributed to the need to use force"); *Asociacion de Periodistas de Puerto Rico v. Mueller,* 529 F.3d 52, 59 (1st Cir. 2008) (denying qualified immunity, finding excessive force where police attacked protestors as they "were attempting to exit" the area where they had gathered, and "without warning, applied pepper spray directly into their face."); *Nelson v. City of Davis,* 685 F.3d 867, 885-6 (9th Cir. 2012) (denying qualified immunity, finding excessive force when police pepper-sprayed and shot pepper balls at noncompliant but nonthreatening demonstrators; collecting cases evaluating pepper spray as unlawful force).

This Circuit has also held that the use of less-than-lethal military weapons similar to pepper spray against nonthreatening people in a group or crowd setting is unconstitutional, even when political speech is not directly implicated. *Ciminillo v. Streicher,* 434 F.3d 461, 468-9 (6th Cir. 2006) (denying qualified immunity, finding excessive force when officer shot beanbag propellants at nonviolent college student attempting to leave gathering); *see also Otero v. Wood,* 316 F.Supp.2d 612, 622 (S.D. Ohio 2004).

All of the cases cited in this section of the Brief were clearly established law many years before the January 2017 demonstration that is the subject of this litigation.

### iii. The Defendant-Officers' use of pepper spray against both Plaintiffs was unconstitutional

Applying the *Graham* analysis to Defendants' use of pepper spray against Plaintiffs here, and in light of the controlling law, Officers Thiel and Masters' use of force was clearly excessive. No reasonable law enforcement officer could have believed otherwise.

*Graham Prong 1: Severity of the Crime*

Not a single protester was arrested the night of January 30, 2017, and none was ever accused of or charged with any crime. To the contrary—the demonstrators were there to express their First Amendment-

14

protected rights. When the plaintiffs were attacked, they were in the act of dispersing from the Demonstration—they were indisputably not committing any crime at all. In the *Graham* analysis, any use of force is excessive when deployed against someone who is suspected of only a nonviolent crime, let alone no crime at all. *See Grawey,* 567 F.3d at 309*; Thacker v. Lawrence Cnty*., 182 F. App'x. 464, 472 (6th Cir.2006).

When Officer Thiel pepper-sprayed Harrison in the face, Harrison had continuously been on the sidewalk engaged in First Amendment-protected speech; had already been incapacitated; was afraid of the police use of force; and was in the act of leaving the area. When Officer Masters grabbed and sprayed Ellen, she also was already incapacitated from having been sprayed before; could not see or breathe well; and was in the act of complying with a police order to leave the area. Neither could reasonably have been thought to be committing any crime at the time that each was sprayed.

*Graham Prong 2: Safety Threat*

It is also undisputed that there was no safety threat to any police officer, demonstrator, or the public at any point during the Demonstration. The Defendant Officers themselves described the event as nonviolent. *E.g.* Masters Dep. 124:16-125:3; 157:14-24; McDonald Dep. 81:13-24. It was, by Officer Masters' own admission, "peaceful." Masters Dep. 157:14-24. And in reviewing the event, the Department's After Incident Report described no injuries other than those inflicted by the Columbus Police. Ex. 1. When there is no threat to any person, or, as here, even lesser-protected property, law enforcement has no reason to use any force, let alone a weapon like pepper spray. *See Headwaters Forest Defense,* 240 F.3d at 1203.

In Harrison's and Ellen's specific cases, neither was armed or believed to be armed, and both were already incapacitated and trying to get away. Moreover, at the time the officers attacked them, Harrison, a high school student, and Ellen, a small woman in her 20s, were outsized and outmatched by the armed

and trained police following them. Vid. Ex. 1, 2, 3.

*Graham Prong 3: Resisting Arrest or Attempt to Flee*

Neither Harrison nor Ellen, nor any other demonstrator that Defendants pepper-sprayed on

January 30 was resisting arrest, because none were under arrest or received an arrest warning. *See* Ex. 1.

Rather, when the police pepper-sprayed the group in the first instance, protestors were exercising their

First Amendment rights. When Officers Masters and Thiel targeted and assaulted them, Ellen and

Harrison were each *following police orders* to disperse and leave the area. When, as here, someone is

already incapacitated and is not attempting to resist police but instead is complying with them, use of

any force, including pepper spray, is unconstitutional. *See Champion,* 380 F.3d at 902-3.

*Additional circumstances*

Beyond the traditional *Graham* factors, at least two additional factors are critical here: the

convergence of the multiple constitutional rights that Defendants infringed and the extreme nature of the

force they deployed. First, because Plaintiffs here were peaceful protestors and Defendants attacked

them in the course of their protected First Amendment speech, Defendants had a heightened duty to

refrain from unlawful seizure. *See Lamb,* 947 F. Supp. at 1263. The constitutionally-protected nature of

the Demonstration underscores that Plaintiffs' behavior was nonviolent and nonthreatening, and this

weighs against the use of *any* police force on Plaintiffs under *Graham.* Second, the Columbus Police did

not just use *any* force here—they used chemical weapons gratuitously and maliciously, applied at very

close range to the Plaintiffs' faces and eyes while Plaintiffs were already disabled from the previous

blast of pepper spray. Courts have recognized that this infliction of pain is an extreme intrusion of

liberty. *E.g. Young v. Cnty. Of Los Angeles,* 655 F.3d 1156, 1162 (9th Cir. 2011) ("pepper spray is

designed to cause intense pain and inflicts a burning sensation…an involuntary closing of the eyes,

gagging reflex, and temporary paralysis of the larynx, as well as disorientation, anxiety, and panic");

*Tracy v. Freshwater,* 623 F.3d 90, 98 (2d Cir. 2010) ("unquestionably, infliction of pepper spray…constitutes a significant degree of force").

As to Plaintiffs' use of force claims against Officers Thiel and Masters, no material fact is genuinely in dispute and Plaintiffs are entitled to judgment as a matter of law. The weight of legal authority in this and other Circuits demonstrates that the violation of Plaintiffs' constitutional rights is clearly established.

**B. Plaintiffs Are Entitled To Judgment As A Matter of Law On Their State Law Assault and Battery Claims Against The Individual Police Officers.**

The undisputed video evidence displaying Defendants Masters and Thiel's gratuitous pepper spray attacks targeting the faces of Ellen and Harrison proves assault and battery under Ohio state law. Defendants themselves have offered some of the very same videos proffered by Plaintiffs as material facts. *E.g.,* ECF No. 63 at Ex. C, T, Y. And Defendants have also confirmed what is clear in the film: that these uses of force were intentional. *See* Masters Dep.174:6-188:11; ECF No. 63 at 18-19; Thiel Dep. 137:18-24; 142:4-22; 146:2-147:22; 149:5-151:2*;* ECF No. 63 at 13-14.

Where an officer uses unreasonable force in the course of his duties, he may be held liable for assault and battery. *D'Agastino v. City of Warren*, 75 F. App'x. 990, 995 (6th Cir. 2003) ("If an officer uses more force than is necessary to make an arrest and protect himself from injury, he is liable to assault and battery" under Ohio law.); *see also Alley v. Bettencourt,* 134 Ohio App. 3d 303, 730 N.E. 2d 1067 (Ohio Ct. App. 1999). As detailed amply above, neither of the Defendant-officers' pepper spray assaults against either Plaintiff was in furtherance of an arrest and neither was necessary to protect anyone from injury.

Officers Masters and Thiel's callous attacks against Plaintiffs—attacks which the police laughingly celebrated—were not merely intentional, but also wanton, reckless, and/or malicious. *See*

*Bettencourt,* 730 N.E.2d at 1067 ("malice means the willful and intentional desire to harm another, usually seriously, through conduct which is unlawful or unjustified."); *see also Jicks v. Leffler*, 119 Ohio App. 3d 424, 428-29 (Ohio Ct. App. 1997) (reasonable minds could find that the police officer acted "with malicious purpose, in bad faith, or in a wanton or reckless manner," in grabbing the arm of plaintiff, a 13-year old girl, and arresting her, because she did not comply with his yelling at her to stop jay-walking); *Otero,* 316 F.Supp.2d at 630 (where plaintiff was not threatening anyone or even acting illegally, use of force against him could be found to constitute wanton, reckless, and/or malicious behavior.)

The Columbus Police had incapacitated the Plaintiffs completely when they pepper-sprayed the group in the first instance. But then, as the undisputed video evidence shows and deposition testimony corroborates, Officers Masters and Thiel pursued and gratuitously attacked Plaintiffs further. For this intentional and malicious conduct, Plaintiffs are also entitled to summary judgment on their state law assault and battery claims against their two attackers.

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that this Court grant summary judgment in their favor as to their Fourth Amendment excessive force claims and state law assault and battery claims against Officers Masters and Thiel in their official and individual capacities.

July 15, 2019

Respectfully submitted,

/s/ *Elizabeth Bonham*
Elizabeth Bonham (0093733)
Freda J. Levenson (0045916)
ACLU of Ohio Foundation, Inc.
4506 Chester Avenue
Cleveland, Ohio 44103
Tel: (216) 472-2220
Fax: (216) 472-2210
ebonham@acluohio.org
flevenson@acluohio.org

David J. Carey (0088787)
ACLU of Ohio Foundation
1108 City Park Ave., Ste. 203
Columbus, OH 43206
Tel: (614) 586-1972 x2004
Fax: (614) 586-1974
dcarey@acluohio.org

**CERTIIFICATE OF SERVICE**

I certify that on July 15, 2019 I filed the foregoing using the Court's ECF system and that a copy was served on all current parties using that system. I further certify that I am filing four video exhibits to this Motion by personal delivery to the Clerk of Court because the ECF system could not accommodate them, and that these will be available to all parties through the Court's electronic docket and served by U.S. mail on counsel for Defendants.

/s/ *Elizabeth Bonham*
Elizabeth Bonham (0093733)

1