**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

ELLEN ABDUR-RAHIM, et al.      :

      Plaintiffs,         :

                Case No. 2:17-CV-00601

      v.                  :

                Judge Sargus

CITY OF COLUMBUS, et al.       :

                Magistrate Judge Vascura

      Defendants.       :

**DEFENDANTS' MEMORANDUM CONTRA**
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs moved for partial summary judgment as to their Fourth Amendment claims of excessive force and state law claims of assault and battery against Defendants Justin Masters and John Thiel. (Doc. #64). Defendants oppose Plaintiffs' motion in its entirety. In their Motion Plaintiffs misstate the record evidence and rely on unsupported allegations. Defendants moved for summary judgment as to the entirety of Plaintiffs' claims and in response to Plaintiffs' instant motion, Defendants incorporate by reference their complete statement of the facts of record, including depositions and exhibits, filed in connection with their Motion for Summary Judgment (Doc. #63 PageID#345-360; Attachs.1-34, and Doc. #66, exhibits filed manually). The video and audio exhibits along with Plaintiffs' testimony establish the relevant circumstances of the January 30, 2017 demonstration beyond dispute. The demonstration began between 5:30 and 6:00 p.m. After the gathering at the State House, around 7:30 p.m., demonstrators walked south to the Franklin County Court House steps at High and Mound Streets. After the gathering there, around 8:00 p.m., the demonstrators retraced their steps going north on High. Throughout this time, as the demonstrators were walking on High, officers on bicycles and in cruisers were trying

to keep them on the sidewalk and out of the street.  By around 8:15 p.m., demonstrators had

taken over the intersection of State and High Streets, closing off any traffic at the intersection.

Some demonstrators remained on the east and west sidewalks of High.  Police officers were

trying to manage the crowd that gathered in the intersection of State and High Streets, and they

formed a police line to keep the demonstrators from going any further south on High.  If the

officers needed to withdraw, there was no space for them to do so.  It was an awkward place to

be in. (JM 160).  Protesters were in front or north of the line of officers and on both sides, on the

sidewalks.  They were way deeper in front of us on the street than they were on the sidewalks.

(JT 83).  The video evidence leaves no dispute that the protesters were obstructing the flow of

traffic at the intersection in violation of law.[1]  There is no dispute Officers were unable to keep

the protesters out of the roadway with the available resources.  The protesters outnumbered the

officers, and a mass arrest was not feasible.  Lt Lipp was concerned that individual arrest might

have escalated the situation form non-violent to violent.  (Lipp Affid. ¶¶25-27).

From approximately 8:15 to 9:00 p.m., police officers issued dispersal orders to the

demonstrators telling them they were in violation of law, that this was an emergency situation,

that they were subject to arrest, and that they should clear the area or chemical agents might be

deployed.  (Doc. #63, PAGEID#345-352).  The officers put gas masks on about twenty to thirty

minutes after the demonstrators had filled the intersection in an effort to gain compliance.  This

tactic was not successful. (JM 160; Lipp Affid.Exhib. 5, p.5).   Abdur-Rahim admitted police

ordered the demonstrators to get out of the street from a cruiser with a bullhorn.  "They told us to

leave the street that we were blocking." (Doc.#63.at PAGEID#354, EA 66).  "Between 8:15

and 9:00 p.m., the police issued orders to disperse, but many people, including the plaintiffs

remained."  EA at 65, 67-68.  She admitted for about 45 minutes, the police warned the

---

[1] Columbus Code of Ordinances 2333.04-Obstrucing city right of way. DOC. 63, PAGEID365-66.

demonstrators if they did not disperse that they were going to deploy pepper spray. *Id*. at 67-68. Moreover, she admitted the protesters could see with their "own eyes" that the police were going to use pepper spray. *Id.* at 68.   She also relayed the message to other demonstrators that the police were going to pepper spray them if they did not clear the intersection and confirmed with others that the crowd did not want to leave the streets. *Id.* at 70-72.  She saw people relaying her message back through the crowd, "not just in my immediate vicinity." *Id*.   And so after the message was relayed, people decided they wanted to stay and risk being pepper sprayed. *Id*. at 72.

The initial deployment of pepper spray occurred at 9:04:17 p.m.  It is apparent most of the demonstrators dispersed from the intersection. (Doc.#63, PAGEID#355).  After the initial deployment, however, Abdur-Rahim was still in the intersection; she had moved somewhat to the center of street. Plaintiff Kallner who had been on the sidewalk at the time of the initial deployment, then moved into the intersection. Neither Plaintiff was incapacitated after the initial deployment of pepper spray.  Plaintiffs did not comply with orders to disperse and to get out of the street.  The video evidence is not in dispute. *Id*. at PAGEID#355-59.  See, *Scott v. Harris,* 550 U.S. 372, 380 (2007).

**The Moment Plaintiff Abdur-Rahim was Pepper Sprayed by Defendant Masters**

Defendants' SJ Mot Exhibit Y, IPhone Video, was taken by someone on the west side of High Street positioned above street level, and shows the moment Abdur-Rahim was sprayed by Officer Masters. This video starts shortly before the initial burst of pepper spray, Abdur-Rahim is visible.  She is not moving out of the intersection; she is not running. This video, *in real time*, shows the momentary nature of Master's burst of spray in her direction and his push on her shoulder to direct to the sidewalk.  He does not grab her.  She is then seen moving very quickly to the sidewalk on the east side of High Street.

When the pepper spray was first deployed at 9:04:17 p.m., Abdur-Rahim was in the front of the crowd. (EA 72).  Just prior to the dispersal of spray, Cruiser 184B video shows her moving behind a banner someone is holding at the front of the demonstrators. Cruiser 184B video also shows Abdur-Rahim in the moments after the initial deployment of pepper spray.  She turned westward, took a step to the north and paused. (Defs' SJ Exhib. B).  She had her mouth and nose covered with her hijab and was crouched over to cover her face. (EA 74, 75)  She did not run when the pepper spray was first deployed.  She did not head to the sidewalk.  She turned westward to the center of the street.  She was with other demonstrators who were standing still rather than leaving the intersection.

Defendants' Summary Judgment Exhibits R, S, T, and U are photographs showing Abdur-Rahim behind the banner, which reads:  "No More presidents Be ungovernable." Exhibits R and S show her with  arms raised behind the sign as pepper spray is deployed ; Exhibit T shows her behind the banner turning westward;  Exhibit U shows her continuing to move westward still behind the banner. Defendants' Exhibit V is a black and white photo that shows Abdur-Rahim has moved a few steps from behind the banner westward and northward. She is stopped in the center of the intersection seconds after the deployment of pepper spray; she is standing next to a male, putting her head down at his shoulder.

Abdur-Rahim is also visible in Go Pro Video 20378, which runs 17 minutes and 43 seconds. (Defs' SJ Exhibit C).  The camera was worn on the helmet of one of the bicycle officers who was facing north on High Street, standing south of the front line of the protesters.  The initial deployment of pepper spray is shown at 17:11 on the GoPro video, which was approximately 9:04:17 p.m.  The GoPro video starts at approximately 8:42 p.m. or after the protesters had been in the intersection of State and High for approximately 30 minutes.  The

GoPro video shows the central area of the intersection and also, given the movement of the camera, captures demonstrators located on the southeast and southwest sides of High Street.  At 17:09, just before the initial deployment of pepper spray, Abdur-Rahim is visible, moving to shield herself behind the banner that reads: "No more presidents Become ungovernable." The deployment of pepper spray starts at 17:11.  After the initial deployment of mace, protesters begin to disperse.  Officers can be seen moving north on High Street to clear the intersection and keep it clear, continuing to order lingering protesters to get out of the street.  By 17:16, Abdur-Rahim has moved somewhat to her northwest, to the center of the street, not too far from the person holding the banner.  She is among a group that is lingering in the center of the intersection, her head is down and she is stopped.  At 17:17 -17:18, she is in the same location. There are at least two males near her, who are not leaving the intersection.  At 17:20, she is standing next to a male.  Two officers are just to the west of Abdur-Rahim and the male; the officers are moving north into the intersection.  They are not running.  At 17:20, the officer in the foreground directs pepper spray toward the male, who is stopped next to Abdur-Rahim. Defendant Officer Masters is walking north behind that officer.  At 17:22, the male and Abdur-Rahim are still in the same location.  Masters walks toward them.  At 17:22, Masters directs a momentary burst of pepper spray with his left hand in Abdur-Rahim's direction and reaches out and gives a quick push to her left shoulder to get her moving eastward to the sidewalk.  BY *cite time* she is seen running to the east side of High Street, the northeast corner.  (Defs' SJ Exhibit C; JM 186-188).  She has no difficulty moving quickly in that direction.

Masters heard the repeated dispersal orders over the loud speaker.  The dispersal orders were very loud and warned the crowd that we were intending to use pepper spray. (JM 152). "We put on gas masks because the dispersal order had been read over and over again, and they

still weren't dispersing. And it was time to step up on the use of force continuum to get them out of the street." "So we started deploying mace." (JM 163). "As soon as the officers started dispersing mace, the crowd started to separate. He observed a few stragglers that weren't listening or either were covering their faces or just weren't sprayed and didn't want to leave." *Id.*

### The Moment Plaintiff Kallner is Pepper Sprayed by Defendant Thiel

At 21:04:17 or 9:04: 17 p.m., Kallner saw the police deploying pepper spray up into the crowd, and that's when he jumped off the trash can. (HK 41). Instead of remaining on the where he was on the sidewalk or heading north on the sidewalk, however, Kallner then entered the intersection. (HK 47). Cruiser 34B video captures Kallner jumping off the trash can on the corner and walking northeast in front of the red car into the street. (Defs' SJ Exhibit A at 21: 04:20). According to Kallner, while he was in the middle of the intersection, he saw a police officer close to him. (HK 44-45). He stopped and said to the officer, "Why are you fucking spraying us?" *Id.* at 44. He alleges that's when he was sprayed with mace. *Id.* He admits he was in street when he received the burst of pepper spray. *Id.* Kallner testified the officer who sprayed him was standing still and wearing a gas mask. *Id.* at 49. He says he didn't see where the officer had come from and he had not seen the officer spray any one. *Id.* at 46, 50.

Video shows Kallner was in the street when he received a short burst of pepper spray. Officer Thiel was not wearing a gas mask; he was not carrying a "shield." He was not the officer to whom Kallner directed his comment. Thiel was not north of Kallner; he was south of Kallner, walking forward or northerly to clear the street. Kallner appears at the left corner of the screen of Cruiser 184B video at 21:04: 28 or 9:04:28. (Defs' SJ Exhibit B). He had been on the southwest corner of High and State, standing on top of a trash can. After he jumped off the trash can, he moved eastward into the intersection. He has long blond hair and is wearing a white hat, dark jacket, and carrying a sign. At 21:04:30 or 9:04:30, he is in the intersection, facing east,

stopping and raising his arms and appearing to say something to another officer when he is pepper sprayed by Thiel at 21:04:32 or 9:04:32. *Id.* The incident happens very quickly, and Kallner moves out of sight as soon as he is pepper sprayed. Thiel continues walking north.

Thiel heard the dispersal orders. (JT 77). After Thiel initially deployed his pepper spray, the intersection started to clear. He took a few steps forward. *Id.* He recalled a male came down off the sidewalk on the west and into the street. *Id.* at 85. The male was headed eastbound; whereas to disperse from the intersection, he would have stayed on the sidewalk. *Id.* at 139. The officers were not blocking the sidewalk; they were trying to clear the street. *Id.* at 140, 141-42. Thiel directed a quick burst of pepper spray towards the man. He did not recall speaking to him. *Id.* After the man was sprayed, he did not stay in the street. *Id.* at 87.

Thiel was not wearing a gas mask or carrying a shield. *Id.* at 82, 100. Thiel did not recall the specifics, but looking at video during his deposition, he could see that the person he sprayed was wearing a white hat and dark jacket and was approaching another officer on the officer's left side. *Id.* at 145. To Thiel, based on the video, it looked as if the man in the white hat was maybe two or three feet away from the other officer, coming up on the officer's left side. "I don't know if the officer even knew he was there." *Id.* at 148. He estimates he was about ten feet away from the male, who was not looking at Thiel. "I sprayed him because the order was to clear the street, and he was walking up on the left side of an officer in the street. In the intersection; he had no reason to approach an officer at that point." *Id.* at 110, 113-114.

Plaintiffs' misrepresentation of the record evidence does not create a dispute of fact. [2] Perhaps the most egregious of Plaintiffs' misrepresentations, for which they offer no evidentiary

---

[2] For example, There is no evidence offered, let alone supporting, that the police outnumbered the demonstrators and that over two hundred police with riot gear armed with shields, dispatched to cover the demonstration and fewer than 100 demonstrators remained in the intersection as of 8:00 p.m.. (Doc. #64, p. 1-2, 6). The video, deposition testimony, and Lt. Lipp's affidavit evidence the demonstrators outnumbered the officers. Moreover, there is no

support whatsoever, is their allegation Defendants Masters and Thiel had body cameras and that after they pepper sprayed Plaintiffs, they recorded themselves celebrating their "attacks" on Plaintiffs. P's Mot. Doc.# 64, p. 2.  First, there is no dispute--neither Masters nor Thiel, nor any officer had a body camera that evening.  Body cameras were not available to the officers at this time. (JM Dep. 114).  Masters and Thiel did not have any type of recording device for the January 2017 demonstration. (JM 115, 117, 139).  And, Plaintiffs have not offered any evidence that either Defendants Masters or Thiel made any comment about Abdur-Rahim or Kallner that evening.   Plaintiffs do not offer any evidence that other officers made comments about Abdur-Rahim specifically, and there is no evidence whatsoever that either Defendant heard the comments of other officers, whatever those comments were, much less that they took part in any conversation with other officers after the deployment of pepper spray.

**Defendant Officers Are Entitled to Qualified Immunity as to Plaintiffs' Fourth Amendment Excessive Force Claim**.

Plaintiff "bears the burden of showing defendants are not entitled to qualified immunity." *Chappell v. City of Cleveland,* 585 F.3d 901, 907 (6th Cir. 2009).

"Qualified immunity shields officials from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Consequently, "the doctrine of qualified immunity protects all but the plainly incompetent or those who knowingly

---

evidence offered, let alone supporting, all of the demonstrators were compliant; the video is beyond dispute—all of the demonstrators who failed to disperse in response to repeated lawful orders were noncompliant. Additionally, Plaintiffs allegation that all demonstrators turned and began to disperse after the initial deployment of pepper spray is likewise demonstrably false.

Kallner never testified, nor did Masters, that "many" of the protesters could not hear the orders to leave the area. (Doc. #64, p. 21).  This allegation is belied by the audio records, Masters' testimony (JM 152) and the testimony of Abdur-Rahim.

violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The U.S. Supreme Court has emphasized courts should not define the law in question at a high level of generality. *White v. Pauly*, 137 S. Ct. 548, 552 (2017), citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

The qualified immunity test is often formulated as a two-part test, requiring a court to decide both "whether the facts that a plaintiff has shown make out a violation of a constitutional right, as well as whether the right was clearly established at the time of the defendant's challenged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

In order for a right to be clearly established for the purpose of qualified immunity, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Roell v. Hamilton Cty*., 870 F.3d 471, 483 (6th Cir. 2017), citing *Estate of Hill v. Miracle*, 853 F.3d 306, 316 (6th Cir. 2017). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Gold v. City of Sandusky*, 2018 U.S. Dist. LEXIS 49567 (N.D. Ohio 2018), citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Especially where there is no declarative Supreme Court precedent lower courts must have defined the contours of the constitutional right at issue with sufficient certainty and clarity that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Gold, supra*, citing *Saucier v. Katz*, 533 U.S. 194, 202 (2001). The Sixth Circuit has explained: "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Gold*, citing, *Rudlaff v. Gillespie*, 791 F.3d 638, 644 (6th Cir. 2015). "Existing case law, in other words, must put the precise question 'beyond debate.' " *Rudlaff* at 633, citing *Ashcroft v. Kidd*,

563 U.S. 731, 131 S.Ct. 2074, 2083 (2011). "the clearly established law must be particularized to the facts of the case.

As an initial matter, this case does not fall neatly within the categories of clearly established Fourth Amendment law on the use of pepper spray.  The first step in analyzing an excessive force claim under 42 U.S.C. § 1983 is to identify the specific constitutional right allegedly infringed.  The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. Const. Amend IV.  An excessive force claim under the Fourth Amendment requires an allegation of the use of excessive force by the government in connection with a *seizure* of the plaintiff. "A person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

In the instant case, there is no dispute, Plaintiffs were always free to leave; Defendants did not terminate their movement.  Plaintiffs could have easily removed themselves from the intersection by simply complying with lawful commands, voluntarily dispersing to the sidewalks.  Defendants had no intention, and made no effort, to *seize* Plaintiffs.  To the contrary, not only were Plaintiffs free to leave, Defendants had ordered them to disperse--to leave the intersection.  Defendants pepper sprayed Plaintiffs because they had not complied with orders to leave the intersection. After Defendants pepper sprayed Plaintiffs, they left the intersection; they knew they were free to leave and walk away.  Defendants did not follow them or restrict their travel.  Defendants did not detain or arrest Plaintiffs.  There is no evidence Plaintiffs were incapacitated by Defendants.  The video conclusively demonstrates that after she was pepper

sprayed Abdur-Rahim quickly hustled to the sidewalk.  After he was pepper sprayed, Kallner also left the intersection and went to the sidewalk.

In *Ciminillo v. Streicher*, 434 F.3d 461 (6th Cir. 2006), the plaintiff alleged the defendant officer shot him in the face with a beanbag propellant as he walked toward the officer with his hands above his head during the course of a riot.  After he was shot, he lay on the ground, and officers approached and told him to stay down.  The district court had analyzed the plaintiff's excessive force claim under the Fourteenth Amendment because it found there was no search or seizure and granted qualified immunity to the officer.  On appeal, the Sixth Circuit reasoned: "It is established law that if the incident out of which litigation arises is neither a search nor a seizure, an excessive force claim will not be analyzed under the Fourth Amendment. *Id*. at 464-65.  The Sixth Circuit considered Ciminillo's allegations he was ordered to stay on the ground and the inference the officer who shot him with the beanbag propellant intended to stop him from coming any closer, and, in light of these allegations held the excessive force claim should have been analyzed under the Fourth Amendment.  The Court denied qualified immunity and remanded the case.

In *Ellsworth v. City of Lansing*, 2000 U.S. App LEXIS 2049 (6th Cir. 2000), the Sixth Circuit considered an appeal of summary judgment based on qualified immunity for defendant officers.  The case arose out of a use of tear gas against union picketers who were blocking the exit gate to a private industrial plant. In addition to affirming judgment for defendants on Plaintiffs' First Amendment retaliation claim, the Sixth Circuit affirmed judgment for defendants as to the use of tear gas.  Because there was no seizure, the Court analyzed the use of force under the Fourteenth Amendment and held that the release of tear gas did not rise to a "conscience-shocking level.  The rally had been underway for nearly three hours. . . although much of the

crowd had already left, approximately 100 people remained—and they showed no inclination to make way for the workers who wanted to leave. " *Id.* at **12-13. See also, *McKeown v. Hairston*, 2007 U.S. Dist. LEXIS 43490 at**8-9 (E.D. Mich. 2007)(distinguishing *Ciminillio* and holding there was no seizure for the purpose of a Fourth Amendment claim where the physical force used by the defendant officer was not accompanied by an effort to restrain or apprehend the plaintiff and there was no evidence that plaintiff subjectively believed or that an objective person in the plaintiff's position would have believed she was not free to leave); *Ostazewski v. Zelenocks*, 2016 U.S. Dist. LEXIS 183166 at **14-19 (E.D. Mich. 2016), adopted by, summary judgment motion granted, *Ostazewski v. Zelenocks*, 2017 U.S. Dist. LEXIS 12669 (E.D. Mich. Jan. 31, 2017)(where the plaintiff alleged the defendant officer pushed her to get her out of the way but did not arrest her or tell her she was not free to go after he moved her, the court held there was no seizure and that the lack of a seizure was fatal to Plaintiff's Fourth Amendment excessive force claim.) See also, *Dundon v. Kirchmeier*, 2017 U.S. Dist. LEXIS 222696 at *58 (N.Dak. 2017)(An excessive force claim under the Fourth Amendment requires an allegation of the use of excessive force by the government in connection with a seizure of the plaintiff.").

It is not clearly established that Plaintiffs herein can maintain a Fourth Amendment excessive force claim in the absence of a "seizure."

Moreover, there is no clearly established law or legal consensus that would have informed a reasonable officer in Defendants' circumstances that using pepper spray in the situation they faced, namely, the imperative to clear lingering protestors from the intersection after the protesters had refused repeated warnings to disperse, was a violation of the Fourth Amendment. See e.g., *Felarca*, *supra*, at 822-823 (granting qualified immunity to officers and reasoning: "To decide whether the law was clearly established, we must first define the law at

issue in a concrete particularized manner. . . . We define the law at issue here as follows: whether an officer violates clearly established law when, after several warnings to disperse have been given, the officer uses baton strikes on a plaintiff's torso or extremities for the purpose of moving a crowd actively obstructing the officer from carrying out lawful orders in a challenging environment. . . . Plaintiffs have identified no such case.")

There is no case holding it is *per se* unconstitutional to use pepper spray to disperse demonstrators who are protesting in the middle of an intersection and illegally obstructing traffic, where those demonstrators have been repeatedly ordered to disperse and repeatedly advised they were in violation of law, subject to arrest, and subject to the use of chemical agents if they did not get out of the intersection.

The cases Plaintiffs cite as "clearly established" Fourth Amendment law on the use of pepper spray by police are factually distinct from the instant circumstances. These cases do not hold that it is unconstitutional to use pepper spray to disperse demonstrators unlawfully gathered in an intersection who have failed to comply with repeated warnings to leave the intersection, much less put it "beyond debate" that Defendants' use of pepper spray in the totality of the circumstances they faced was an infringement upon Plaintiffs' Fourth Amendment rights. The cases Plaintiff cite: *Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994); *Atkins v. Flint*, 94 Fed. Appx. 342 (6th Cir. 2004); *Gawry v. Drury*, 567 F.3d 302 (6th Cir. 2009); *Greene v. Barber,* 310 F.3d 880 (6th Cir. 2002); *Vaughn v. City of Lebanon*, 18 F. App's 252 (6th Cir. 2001); *Champion v. Outlook Nashville, Inc*., 380 F.3d 893 (6th Cir. 2004); *Cabaniss v. City of Riverside*, 231 F. App'x. 407 (6th Cir. 2007)--all involved individuals who were arrested or detained and where it was alleged officers used excessive force, including pepper spray, in the process of arresting them; the cases involved issues as to the arrestees' conduct, such as whether they were resisting

arrest, and whether or not they were controlled, immobilized, or handcuffed prior to the use of pepper spray.

Additionally, cases involving the use of pepper spray in the context of First Amendment protests do not clearly establish that Defendants' use of pepper spray infringed Plaintiffs' Fourth Amendment rights. In *Singleton v. Darby*, 609 Fed. Appx 190 (5th Cir. 2015), for example, the Fifth Circuit affirmed summary judgment for defendant officers who pepper sprayed protesters blocking a road, expressly recognizing: "The First Amendment does not entitle a citizen to obstruct traffic or create hazards for others. A state may enforce its traffic obstruction laws without violating the First Amendment, even when the suspect is blocking traffic as an act of political protest." *Id*. at 193. The Fifth Circuit noted video evidence demonstrated the plaintiff was obstructing traffic in violation of Texas law. "Thus Singleton was not engaging in constitutionally protected activity at the time Darby pepper sprayed her." *Id.* The Fifth Circuit further rejected that the plaintiff had created a fact issue on the motivation element. "The record fails to show that Darby pepper sprayed the protesters for any reason other than to clear the road. Darby did not disturb the protesters on the sides of the road and ordered plaintiff to 'get out of the road,' rather than to cease the protest entirely." *Id*. at 194. The Fifth Circuit affirmed summary judgment for the defendant officer on Plaintiff's Fourth Amendment claim that the use of pepper spray constituted excessive force. The Court held deploying pepper spray was not an unreasonable way to defuse the situation, and was probably the least intrusive means available to the defendant officer. The Fifth Circuit noted the protesters vastly outnumbered police. In addition to the obvious difficulty of one officer attempting to handcuff so many violators, the officer faced the likelihood that such an action could motivate a larger number of protestors lining the road to join in the road-blocking. The decision to use pepper spray was therefore not

an unreasonable way to gain (and maintain) control of a potentially explosive situation.  *Id*. at

195.

      In *Felarca v. Birgeneau*, 891 F.3d 809 (9th Cir. 2018), the Ninth Circuit reversed the

district court and held defendant police officers did not violate plaintiffs' Fourth Amendment

rights in using force to remove them from their encampment on the university grounds and that

the officers were also entitled to qualified immunity. The Ninth Circuit recognized the officers

had a government interest in maintaining order.  There were thousands of protesters encamped in

violation of university policy. The protesters ignored repeated bullhorn warnings that the no-

camping policy would be enforced.  The protesters blocked police from removing the

encampment.  The officers used their hands and batons to move the crowd, gain access to tents,

and dismantle encampment.   The protesters continued to block police, and police again used

their hands and batons to access and move tents. At least 36 protesters were arrested.  One

plaintiff testified he stayed in the front of the crowd intentionally because he could withstand the

blows. Each plaintiff was hit by a baton in the torso or extremities. In assessing the reasonability

of the use of force, the Ninth Circuit noted: (1) the protesters outnumbered police; (2) they

refused to obey the officers' commands to disperse; and (3) the plaintiffs understood the police

had ordered them to disperse; they ignored or dismissed those orders, and instead directly

interfered with officers' attempt to enforce university policy.  The Ninth Circuit granted qualified

immunity to the Defendants, reasoning: "To decide whether the law was clearly established, we

must first define the law at issue in a concrete particularized manner. . . . We define the law at

issue here as follows:  whether an officer violates clearly established law when, after several

warnings to disperse have been given, the officer uses baton strikes on a plaintiff's torso or

extremities for the purpose of  moving a crowd actively obstructing the officer from carrying out

lawful orders in a challenging environment. . . . Plaintiffs have identified no such case." *Id.* at 822-823.

In *Crowell v. Kirkpatrick*, 400 Fed. Appx. 592 (2nd Cir. 2010), the Second Circuit affirmed summary judgment for officers on the plaintiff protesters' excessive force claim holding that the use of tasers to forcibly remove plaintiffs from private property was objectively reasonable and that the officers were entitled to qualified immunity.  The Court noted, among other issues, that the officers warned the protesters they would be tased. See also, *Brown v. City of New York*, 862 F.3d 182, 192 (2nd Cir. 2017), the Second Circuit recently affirmed summary judgment for defendant officers based on qualified immunity, explaining the plaintiff was unable to demonstrate that administering pepper spray at a distance of as short as one foot upon an uncooperative arrestee violated "clearly established Fourth Amendment law against excessive force.

*Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125 (9th Cir. 2002), a Ninth Circuit decision cited by Plaintiffs, where the defendant officers were denied qualified immunity for their use of pepper spray involved very different factual scenarios from the instant one. Officers were in the process of arresting seven to four protesters in separate incidents.  In each case, the officers had the protesters in control so that they could not flee; the protesters had secured themselves with lock down devices, "black bears," on private property and were trespassing.  The Court recognized the officers knew they could have easily removed the black bears with a hand-held electric grinder, and, in fact, did so.  Prior to doing so, however, the officers applied pepper spray with Q-tips to the protesters' eye lids.  The court recognized the officers had control over the protesters so that it would have been clear it was unnecessary to pepper spray them in order to arrest them.

Similarly, additional cases cited by Plaintiffs are factually distinct and would not have established beyond debate that Defendants' conduct was a violation of the Fourth Amendment. See e.g,, *Lamb v City of Decatur*, 947 F. Supp. 1261 (C.D. Ill. 1996). This case involved the use of pepper spray to break a labor demonstration at a private manufacturing plant; it did not involve an illegal obstruction of traffic in a public intersection.  The district court in *Lamb* acknowledged that this was not a typical excessive force case and that the case law on the use of pepper spray is limited.  So stating, the court declined to say either that the force used by the police officers in using pepper spray was excessive or not excessive; *Buck v. City of Albuquerque*, 549 F.3d 1269 (10th Cir. 2008) involved claims of unreasonable seizures and arrests during an anti-war protest along with claims that the force used to effectuate the arrests was excessive. *Id*. at 1287.  The court denied summary judgment based on qualified immunity concluding that a jury might find unreasonable the repeated shooting of pepper ball rounds at a plaintiff who was lying in the street, the use of tear gas on a handcuffed plaintiff, and the hitting, kicking, shaking and pulling of a plaintiff by the straps of his backpack while pepper spraying him. *Id.* at 1288.  *Fogerty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008) also involved an anti-war protest and plaintiffs' claims of illegal seizure, that is, false arrest for disorderly conduct and disturbing the peace, along with claims of the accompanying use of force--pepper ball projectiles, tear gas, and forcible dragging (Fogarty1159).  Defendants were denied qualified immunity.

Plaintiffs have not sought summary judgment on the basis of the Fourteenth Amendment; nevertheless, it is clear that the standard which must be met to establish excessive force in violation of the Fourteenth Amendment is a more burdensome standard than the "objective reasonableness" standard of the Fourth Amendment.  To maintain a Fourteenth Amendment

excessive force claim, Plaintiffs would have to establish, among other things, that the specific application of force "shocks the conscience." *Wilson v. Spain*, 209 F.3d 713, 716 (8th Cir. 2000); *Dundon v. Kirchmeier*, *supra* at *58.  Not only is there a lack of Fourteenth Amendment law to support that Defendants' use of pepper spray on Plaintiffs "shock the conscience," there is no clearly established law that would have informed a reasonable officer in Defendants' circumstances that their use of pepper spray violated Plaintiffs' Fourteenth Amendment rights.

In sum, Defendant Officers are entitled to qualified immunity because there is no clearly established law that would have put them on notice they were infringing upon Plaintiffs' Fourth Amendment rights by using pepper spray to disperse them from the intersection, in the absence of any seizure, and given the totality of the circumstances, including Plaintiffs' repeated failure to comply with lawful orders to disperse.

**Defendant Officers' Use of Pepper Spray Was Objectively Reasonable.**

As explained above, Plaintiffs were not "seized" by Defendants; they were always free to leave and walk away.  Assuming for the sake of argument, however, that Plaintiffs' claims of excessive force could properly be considered under the Fourth Amendment, their claims would nevertheless fail because Defendant Officers' actions were "objectively reasonable." *Graham v. Connor*, 490 U.S. 386, 388 (1989).  The Supreme Court has held Fourth Amendment excessive force claims "are properly analyzed under the objective reasonableness test," which requires an analysis as to whether the individual officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation. *Id.* at 397.  "In evaluating the totality of the circumstances and the objective reasonableness of the force, we 'must be sure to view [the] facts from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " *Id*. at 444-45.  This analysis contains a built in measure of deference to the officer's on the spot judgment of the level of force necessary

in light of the circumstances. *Id*. at 445.  "The application of this 'reasonableness' test requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Chappell*, *supra* at 908, quoting *Graham* at 396.  Nevertheless, the *Graham* factors do not constitute an exhaustive list; "the ultimate question is 'whether the totality of the circumstances' justifies a particular sort of seizure." *Simmonds v. Genesee County*, 682 F.3d 438, 444 (6th Cir. 2012).

Courts have recognized the difficulty in applying the standard *Graham* factors to atypical cases not involving a criminal suspect's arrest or detention. See e.g., *Estate of Hill v. Miracle*, *supra,* in which the Sixth Circuit established a separate set of  factors for analyzing Fourth Amendment claims of excessive force by emergency medical responders.  The Sixth Circuit reversed the lower court and granted summary judgment based on qualified immunity.  The Sixth Circuit recognized, ". . . [N]o appellate court has previously provided any guidance on how to assess objective reasonableness in the atypical situation of a medical emergency."  *Id*. at 313. "Rather than continuing to struggle with this dilemma, we suggest that a more tailored set of factors [than Graham's] be considered in the medical-emergency context, always aimed towards the ultimate goal of determining 'whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Id.*  The instant case, which does not involve a detention or arrest of Plaintiffs, likewise presents an atypical factual scenario where the objective reasonableness of the officers' actions cannot be adequately assessed based on the three standard *Graham* factors.  The ultimate question is whether Defendants' actions were objectively reasonable based on the totality of the circumstances. *Simmonds*, supra at 444.

In general, the Sixth Circuit has afforded a great deal of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case.  The lawfulness of the officer's conduct should be judged from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Baynes v. Cleland*, 799 F.3d 600, 607-08 (6th Cir. 2015), citing *Graham, supra* at 396.  The court is not to substitute its own ideas as to what is proper police procedure for the instantaneous decision of the officer at the scene. *England v. Schrand*, 2012 U.S. Dist. LEXIS 176138 at *19 (S.D. Ohio 2012).

"Also irrelevant . . .  is whether or not the officer had other means of force at his disposal. '[T]he Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances.'" *Davenport, supra* at 552, citing *Dickerson v. McClellan*, 101 F.3d 1151, 1160 (6th Cir. 1996).

There is no dispute, at the time Defendants used pepper spray on Plaintiffs, both Plaintiffs were in the intersection.  Neither one had complied with orders to disperse.

A reasonable officer in Thiel's position would have observed that Kallner was in the intersection after the initial deployment of pepper spray.  A reasonable officer would have concluded that Kallner was not compliant with orders to disperse.  Kallner was standing in the intersection. Kallner's argument that he did not hear the dispersal warnings is specious; nevertheless, it is not relevant, what is relevant is what a reasonable officer would have concluded.  In a case with somewhat similar facts, the court explained the plaintiff's argument that he did not hear the orders to disperse and did not receive an individualized warning was irrelevant because the qualified immunity analysis focuses on what the defendant knew at the time and what a reasonable officer under the circumstances could infer from plaintiff's actions.

*Ruch v. McKenzie*, 2019 U.S. Dist. LEXIS 52212 (N.D. Ga. 2019).  In *Ruch*, the plaintiff

claimed his arrest in the course of a First Amendment protest at police headquarters violated his

constitutional rights. During the protest a large fight broke out, and officers attempted to arrest

individuals involved in the fight.  The undisputed evidence showed an officer gave several orders

over a bullhorn for the protesters to disperse from the area around the fight and protesters

proceeded to disperse. Video footage showed plaintiff stepping off the sidewalk in one location,

walking around a group of people . . . and stepping back onto the sidewalk directly into the area

where the officers were making arrests.  He was moving toward the area the officers were trying

to secure.  The defendant officer saw the plaintiff ignore the orders and approach the area around

the officers' making arrests.  She did not know what his intentions were, but she feared he

intended to interfere with the arrests and might be a threat to officers.  She arrested him for

failing to follow the orders to disperse.  The court held it was undisputed that plaintiff did not

comply; the drone footage established his movement beyond any doubt.  A reasonable person in

the defendant's position could have believed she had probable cause to arrest plaintiff for

attempting to obstruct the officers arrests of those involved in the fight.   See also, *Hicks v. City

of Portland*, 2006 U.S. Dist. LEXIS 101049 (Oregon 2006) at \*\*23-24 (given the fact that other

protesters complied with officers' efforts to clear the street, the plaintiff's assertion that she did

not understand the police order to stay out of the street was dubious at best. Moreover, her

mental state was simply not relevant when determining whether there was probable cause to

arrest her for failure to comply with a lawful police order).

There is no dispute Thiel was not following or targeting Kallner.  After the initial

deployment of pepper spray, Theil walked northbound into the intersection.  The video

demonstrates Kallner left the sidewalk and walked into the intersection, where he stopped and

confronted an officer with the question or accusation, "Why are you fucking spraying us?" Thiel was southeast of Kallner; he saw Kallner to his left in the intersection.  He directed a very brief burst of pepper spray in Kallner's direction.  Kallner left the intersection, and Thiel kept heading north. (Doc. #63, PAGEID#355-57).

Similarly, a reasonable officer in the position of Defendant Masters would have observed that Abdur-Rahim was still in the intersection after repeated orders to disperse throughout the 45 minutes and that after the initial dispersal, she was still standing in the middle of the intersection. Once again, Abdur-Rahim's purported subjective intent to comply with orders to disperse, that is, her argument she could not move from the intersection because she was incapacitated after the initial deployment of pepper spray, while specious, is not relevant.  "What matters is what a reasonable person in the position of the defendant officer would have believed." *Thayer v. Chiczewski*, 2010 US. DIST. Lexis 31516 (N.D. Ill.  2010).aff'd. on the basis of qualified immunity *Thayer v. Chiczewski*, 697 F.3d 514 (7th Cir. 2012).  See also, *Stanfield v. City of Lima,* 244 F. Supp. 3d 638, 646 (N. D. Ohio 2017), citing *Rudlaff v. Gillespie,* 791 F.3d 638, 642 (6th Cir. 2015)**.**  There is no dispute that she failed to comply with dispersal orders.

In the instant case, the demonstrators, including Plaintiffs, were warned for approximately forty-five minutes that police would use pepper spray to disperse them if they did not get out of the street.  The video evidences the protesters did not comply with the level one warnings and made clear their intention to stay in the street and be pepper sprayed.  The Sixth Circuit reinforced that "active resistance includes "physically struggling with, threatening, or disobeying officers." *Kelly v. Sines*, 2016 U.S. App. LEXIS 8477 at *6-7 (6th Cir. 2016), citing *Rudlaff v. Gillespie*, 791 F.3d 638, 641 (6th Cir. 2015).  In *Kelly*, the Sixth Circuit also

recognized that "[a] plaintiffs' resistance to an officer's commands is relevant even if the officers were not attempting to arrest him." *Kelly* at *7.

Defendants' use of pepper spray was a reasonable way to gain compliance and clear the intersection. Plaintiffs' Fourth Amendment claim of excessive force fails as a matter of law.

**Defendant Officers Have Immunity from Plaintiffs' State Law Claim of Assault and Battery.**

Defendant Officers are also immune from liability as to Plaintiff's state law claims of assault and battery pursuant to R.C. 2744.03(A)(6), which provides immunity for employees of political subdivisions, as follows:

> In addition to any immunity or defense referred to in division (A)(7) of this section, and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:
>
> (a)  The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
>
> (b)  The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
>
> (c)  Civil liability is expressly imposed by a section of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee.

By its very terms, R.C. 2744.03(A)(6) operates as a presumption of immunity for an employee of a political subdivision in connection with a governmental or propriety function. *Cook v. Cincinnati,* 1st Dist. No. C-930876, 103 Ohio App.3d 80, 90, cert. denied, 116 S.Ct. 1353 (1996). To avoid the presumption of immunity, Plaintiff must demonstrate that the conduct of an employee falls within one of the enumerated exceptions of R.C. 2744.03(A)(6).

Ohio courts have clarified individual immunity under 2744.03(A)(6)(a) in connection with the corresponding immunity for state employees, "In the context of immunity, an employee's wrongful act, even if it is unnecessary, unjustified, excessive or improper, does not automatically take such act manifestly outside the scope of employment." *Caruso v. State of Ohio*, 10th Dist. No. 99AP-534, 136 Ohio App.3d 616, citing *Elliott v. Ohio Dep't of Rehab. and Corr.*, 10th Dist. No. 93AP09-1268, 92 Ohio App.3d 772, 775. "It is only where the acts of state employees are motivated by actual malice or other reasons giving rise to punitive damages that their conduct may be outside the scope of their state employment. . . . The act must be so divergent that it severs the employment relationship." *Id.*

There is no legitimate dispute that Defendant Officers' uses of pepper spray were well within the scope of their official responsibilities. Therefore, subparagraph (a) of R.C. 2744.03(A)(6) is not applicable. Additionally, there is no argument that R.C.2744.03(A)(6)(c) applies. The sole question for purposes of the immunity analysis is whether there is any evidence to support a finding that the exception of subparagraph (b) exists. Thus, Defendant Officers are entitled to immunity from civil action unless they acted with "malicious purpose, in bad faith, or in a wanton or reckless manner."

As explained above, the use of force or the actions of each Defendant Officer was objectively reasonable; thus, no rational trier of fact could conclude he acted wantonly or recklessly, let alone maliciously. See, *Burdine, supra* at 171, citing *Chappell*, at 916 n.3 ("Inasmuch as plaintiff has failed to demonstrate that defendants' conduct objectively unreasonable, it follows that she had also failed to demonstrate the defendants acted with a malicious purpose, in bad faith, or in a wanton or reckless manner, such as is required to avoid statutory immunity under Ohio law."); *Pollard v. City of Columbus*, 780 F.3d 395, 404 (6th Cir.

2015).  Plaintiffs' reference to *Hicks v. Leffler,* 119 Ohio App.3d 424 (10th Dist. 1997) as

supportive of their assault and battery claim is inapposite.  The appellate court in *Hicks* held

there issues of material fact as to whether there were extraordinary circumstances supporting the

"arrest" of a minor.  The court did not address any claim of assault and battery or indicate that

such claim had been made.  In particular, the court did not state or suggest that the defendant

officer's grabbing the minor's arm after she walked in front of his cruiser constituted assault.

### Plaintiffs Do Not Present an Argument for Liability as to Defendant City.

Lastly, Plaintiffs assert they are moving for judgment against Officers Masters and Thiel

in their individual and "official" capacities.  "Official capacity" suits are not suits against the

individual but rather suits against the governmental entity.  Plaintiff's official capacity suit is a

suit against the City, but Plaintiffs do not address their *Monell* claim against the City in their

instant motion, nor do they address the City's immunity from their state law claims.  To the

contrary, they assert they will address their *Monell* claims at trial.  (Doc.#64, p.4).  Defendants

incorporate by reference the argument in their Motion for Summary Judgment that Plaintiffs

failed to state a claim against Defendant City or an "official capacity" claim against Defendant

Officers.

### CONCLUSION

For all the above-stated reasons, Plaintiffs' motion for partial summary judgment on their

Fourth Amendment claim of excessive force should be denied.

Respectfully submitted,

CITY OF COLUMBUS, DEPARTMENT OF LAW

ZACH KLEIN, CITY ATTORNEY

s/Paula J. Lloyd
Paula J. Lloyd (0033419)
Michael R. Halloran (0089093)
Assistant City Attorneys

77 N. Front Street
Columbus, Ohio 43215
(614) 645-0808
pjlloyd@columbus.gov
mrhalloran@columbus.gov

Attorneys for Defendants

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Defendants' Memorandum

Contra Plaintiffs' Motion for Partial Summary Judgment was served on Plaintiffs' counsel Freda

J. Levenson and Elizabeth Bonham, ACLU of Ohio Foundation, Inc., 4506 Chester Avenue,

Cleveland, Ohio 44103 by electronic filing this 2nd day of August 2019.

s/Paula J. Lloyd
Paula J. Lloyd