UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ELLEN ABDUR-RAHIM,** *et al.,*

    **Plaintiffs,**

    **v.**

**CITY OF COLUMBUS,** *et al.,*

    **Defendants.**

**Case No. 2:17-cv-601**
**JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Chelsey M. Vascura**

<u>**OPINION AND ORDER**</u>

Plaintiffs Ellen Abdur-Rahim and Harrison Kallner (collectively "Plaintiffs") have filed a Motion for Partial Summary Judgment (ECF No. 64). Defendants City of Columbus, Interim Chief of Police Thomas Quinlan, Lieutenant Jeffrey Lipp, Officer Justin Masters, and Officer John Thiel (collectively "Defendants") have filed a Motion for Summary Judgment (ECF No. 63). Both parties have responded and replied (ECF Nos. 69, 70, 71, 72). Therefore, the parties' motions are ripe for review.

For the following reasons, the Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment (ECF No. 64) and **GRANTS in PART and DENIES in PART** Defendants' Motion for Summary Judgment (ECF No. 63).

**I.**

On January 27, 2017, President Trump issued Executive Order 13769, which, among other changes to immigration policies and procedures, banned individuals of seven countries from entering the United States for 90 days. This Executive Order is commonly known as President Trump's "Muslim Ban." The Columbus Division of Police learned from social media that more than 1,900 people planned to protest the Muslim Ban at the Ohio Statehouse on January 30, 2017.

(Pls.' Mot. Partial Summ. J., Ex. 2, ECF No. 64-2.) Protest organizers named the demonstration "Rally for the 99%." (Answer at 16, ECF No. 33.)

In response to the number of people expected to attend the demonstration, Lieutenant Lipp, the incident commander for the planned protest, developed an incident action plan. (Lipp Aff. at ¶¶ 7,9, ECF No. 63-20; Pls.' Mot. Partial Summ. J., Ex 2.) This plan detailed the protocol for patrolling the demonstration. (*Id.*) According to the Incident Action Plan, the Columbus Division of Police's mission was "to provide a safe environment for those expressing their [First] Amendment rights, to maintain the safe flow of vehicular and pedestrian traffic, to prevent civil disorder, and to protect people and property." (Pls.' Mot. Partial Summ. J., Ex. 2.) The Incident Action Plan stated that "[t]he Division will take appropriate enforcement actions as necessary to achieve the assigned mission." (*Id.*) The Incident Action Plan contained "enforcement notes," which stated the following:

> If the crowd becomes violent or confrontational, there are obvious violations of the law, and it is no longer possible to safely provide basic police and fire services to the area, the dispersal order will be given. The order will be made over the PA of a cruiser and/or bullhorn. The dispersal order will be given at least two times, and more if practical. If the crowd fails to disperse from the affected area, officers will be directed to guide protestors from the area. Chemical mace may be used, as directed by the Incident Commander or designee, for protestors. Other chemical agents or munitions may be deployed if necessary.

(*Id.*)

As expected, the Rally for the 99% demonstration began at the Ohio Statehouse around 6:00 p.m. on January 30, 2017. (Kallner Dep. 28:4–9, ECF No. 63-31; Masters Dep. 124:16–125:3, ECF No. 63-32.) Plaintiffs arrived separately at the Ohio Statehouse around 6:00 p.m. (Abdur-Rahim Dep. 45:21–46:23, ECF No. 63-30; Kallner Dep. 21:2–22:4.) There, the protestors peacefully chanted and sang until about 7:30 p.m. (Kallner Dep. 28:4–19; Masters Dep. 124:16–

125:3.) The group then began a planned march from the Statehouse to the Franklin County Court of Common Pleas. (Kallner Dep. 29:16–31:5.)

When the protestors marched south toward the Franklin County courthouses, some began "flooding the streets." (Kallner Dep. 30:18–19.) In cruisers and on foot, police officers tried to keep protestors on the sidewalk instead of in the streets, but their efforts were unsuccessful and protestors marched in the streets. (*Id.*) Around 7:45 p.m., Columbus public buses were "advised to pull off High Street because protestors occupied the roadway." (Lipp Aff. at ¶ 16.)

Protestors had gathered at the footsteps of the Franklin County Court of Common Pleas by 7:53 p.m. (*Id.* at ¶ 18.) There, the protestors occupied Mound Street, which blocked vehicles from traveling between South High Street and Front Street. (*Id.*) Around 7:57 p.m., the protestors then began marching back toward the Statehouse. (Defs.' Mot. Summ. J., Ex. B, ECF No. 63.) They occupied the northbound lanes of High Street, which stopped traffic. (*Id.*, Ex. A.)

The protestors arrived at the intersection of South High Street and State Street (the "Intersection") around 8:14 p.m. (*Id.*, Ex. B.) Approximately 150 to 300 protestors remained in the Intersection, completely blocking traffic in all directions. (Masters Dep. 127:18–20; Lipp Aff. at ¶ 21.) They did not have a permit or permission to obstruct any street. (Lipp Aff. at ¶ 40.)

Directly south of the Intersection, police staged a small field force across all of South High Street's lanes. (Lipp Aff. at ¶ 34.) From 8:20 p.m. to 9:00 p.m., Lieutenant Lipp and other police personnel gave dispersal orders over cruiser-loudspeakers and bullhorns. (*Id.* at ¶¶ 24–25.) The dispersal orders advised the protestors who remained in the Intersection that: they were violating Ohio law, there was an emergency situation, the law required them to clear the Intersection or be subject to arrest, and police may deploy chemical agents if protestors did not disperse. (*Id.* at ¶ 24;

3

Defs.' Mot. Summ. J., Ex. B.) Despite the repeated dispersal orders, many protestors remained in the Intersection. (Lipp Aff. at ¶ 25.)

After protestors refused to leave the Intersection, Lieutenant Lipp was concerned individual arrests might escalate the situation from non-violent to violent. (*Id*. at ¶¶ 26–27.) He also knew that mass arrests were infeasible. (*Id*. at ¶ 26.) So, around 8:42 p.m., Lieutenant Lipp requested additional officers and supervisors to respond to the Intersection. (*Id*. at ¶ 30.) He then directed officers to don their gas masks in front of the protestors to gain compliance. (*Id*. at ¶ 32.) The tactic was unsuccessful, and protestors remained in the Intersection. (*Id*.) Lieutenant Lipp decided pepper spray (also referred to as "mace") was necessary but chose to wait to deploy any until additional officers arrived at the scene. (*Id*. at ¶ 33.)

Around 9:04 p.m., Lieutenant Lipp advised officers to use a two-second spray of mace over the heads of the protestors who remained in the Intersection to clear it. (*Id*. at ¶¶ 40, 45.) Police officers deployed pepper spray at 9:04 p.m. (Lipp Aff. at ¶ 45; Masters Dep. 163:1–15.) By 9:24 p.m., all protestors had cleared the Intersection and nearby roadways. (Lipp Aff. at ¶ 46.) There were no injuries other than to those who were sprayed with mace. (Defs.' Mot. Summ. J., Ex. 5 at 6, 9, ECF No. 63-25.) No arrests were made. (*Id*.)

## A. Plaintiff Harrison Kallner's Experience on January 30, 2017

Kallner joined the group of protestors outside of the Statehouse and marched with the group until they returned to the Intersection. (Kallner Dep. 23:15–17, 33:5–7.) There, Kallner stood on a trashcan on the sidewalk of the Intersection's southeast corner for about thirty minutes. (Kallner Dep. 40:11–14; 42:13–16.) Kallner was roughly fifteen feet from where the police were preparing to deploy pepper spray on the protestors in the Intersection. (*Id*. at 42:8–10.) While standing on the trashcan, Kallner held a sign, took photos, and recorded videos of the demonstration. (*Id*. at

40:13–14; 42:20–22.) Although police repeatedly ordered the protestors in the Intersection to disperse from 8:15 p.m. to 9:00 p.m., Kallner testified he did not hear any of those orders. (*Id.* at 42:7.)

When police began deploying mace over the crowd of protestors in the Intersection, Kallner remained on the trashcan. (*Id.* at 44:2–4.) He "could feel some [] stinging on [his] face and [] was coughing" from the initial deployment of pepper spray. (*Id.* at 55:5–7.) As the crowd began dispersing, Kallner climbed down from the trashcan, left the sidewalk, and ran into the Intersection "in the opposite direction of the crowd." (*Id.* at 44: 7–12.) That is, he ran from the Intersection's southeast corner toward its northwest corner. (Kallner Dep., Ex. B) While in the Intersection, "there was a police officer that was standing close to [him]." (Kallner Dep. 44:17–18; 45:3–5.) "[U]pset and confused," Kallner asked the officer, who was later identified as Officer Thiel, "[w]hy are you fucking spraying us?" (*Id.* at 46:9; 44:19–20.) As Officer Thiel and Kallner stood "in the middle of the street," Officer Thiel "held out his arm and sprayed [Kallner] in the face." (*Id.* at 44:10–11, 21–22.)

Kallner "was in a lot of pain" and "scream[ed] for help." (*Id.* at 51:20–21.) Other protestors assisted Kallner to the sidewalk and gave him water and breast milk to flush out his eyes. (*Id.* at 51:20–52:15.) Kallner then went into an ambulance. (*Id.* at 52:15–22.) The medic let him sit for a few minutes to calm down but did not treat him. (*Id.*) Kallner exited the ambulance, having regained his sight, and received a ride home. (*Id.* at 56:2–4; 53:17–18.) His pain lasted about twenty-four hours. (*Id.* at 58:11–13.) His clothes were ruined. (*Id.* at 59:3–9.) He has since stopped attending street protests because of the incident. (*Id.* at 59:16–60:3.)

## B. Plaintiff Ellen Abdur-Rahim's Experience on January 30, 2017

After marching from the Statehouse to the Franklin County courthouses and back, Abdur-Rahim stood with the crowd in the Intersection. (Abdur-Rahim Dep. 65, 67–68.) Abdur-Rahim was in the "front line" of the crowd, directly north of the line of police officers. (*Id.* at 64:23–65:1.) She admits that from about 8:15 p.m. to 9:00 p.m., police issued dispersal orders but many people, including herself, chose to stay in the Intersection. (*Id.* at 67:12–15.) Abdur-Rahim told other protestors that the police were going to pepper spray the group. (*Id.* at 70:11–12.) But the crowd—as well as Abdur-Rahim—"did [not] want to leave the streets." (*Id.* at 70:12–13.)

Remaining in the Intersection and close to the line of police officers, Abdur-Rahim stood behind a large banner when the first round of pepper spray was deployed. (Defs.' Mot. Summ. J., Ex. T, Ex. U, ECF Nos. 63-16, 63-17.) She had her face covered with her hijab. (*Id.*) Abdur-Rahim testified, however, that the pepper spray "seeped through [her hijab] because it [was] cotton." (Abdur-Rahim Dep. 103:1–5.)

She then turned in the opposite direction and started slowly moving "to get away from the pepper spray." (Defs.' Mot. Summ. J., Ex V, ECF No. 63-18; Abdur-Rahim Dep. 75:19–76:17, 90:18–20.) Officers begin moving north into the Intersection to clear the remaining protestors out of the street. (Defs.' Mot. Summ J., Ex. C.) Officer Masters used his left hand to give Abdur-Rahim a shove on the shoulder and then sprayed mace in her face. (*Id.*; Abdur-Rahim Dep. 76:8–9.) Abdur-Rahim then walked towards the sidewalk to "find some type of relief." (*Id.* at 76:13.) Her "body was burning," particularly her left eye. (*Id.* at 80:16–19.)

She reunited with her friends on the sidewalk and then attempted to wash her face in a pizza shop restroom. (*Id.* at 77:1–3; 79:3–19.) This did not relieve the pain. (*Id.* at 79:20.) Next, she attempted to get help from an EMT who stated he did not have anything to help her. (*Id.* at

84:11–16.) Finally, she obtained a ride to a friend's house. (*Id.* at 84:21–85:18.) Abdur-Rahim experienced pain and burning from the pepper spray and her mental health has since suffered. (*Id.* at 94:16–18, 96:6–23.)

## C. Procedural History

Plaintiffs assert three causes of action in their Third Amended Complaint. They bring two Section 1983 claims against all Defendants for violating Plaintiffs' First Amendment rights to be free from retaliation and Fourth Amendment rights to be free from excessive force. Plaintiffs' also bring state law claims for assault and battery against Officers Masters and Thiel.[1] On July 12, 2019, Defendants moved for summary judgment on all of Plaintiffs' claims. On July 16, 2019, Plaintiffs moved for summary judgment on their excessive force claims against Officers Masters and Thiel and their assault and battery claims. The parties have fully briefed those cross-motions; thus, they are ripe for review.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine disputes of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). To avoid summary judgment, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

---

[1] Plaintiffs' Third Amended Complaint asserts the assault and battery claim against "Three Unnamed Columbus Police Officers." (*See* Third Am. Compl., ¶ 17, ECF No. 31.) When discussing this claim at summary judgment, the parties only mention Officers Masters and Thiel. The Court will analyze the claim as against Officers Master and Thiel.

(1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). Further, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

Here, the parties have filed cross-motions for summary judgment. When both parties seek to resolve a case with cross-motions for summary judgment, the legal standard does not change. *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016). Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. *Id.* Therefore, the fact that one party fails to satisfy that burden on its own Rule 56 motion does not automatically indicate that the opposing parties have satisfied the burden and should be granted summary judgment on the other motion. In reviewing cross-motions for summary judgment, courts must evaluate each motion's merits and view all facts and inferences in the light most favorable to the non-moving party. *Wiley*

*v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Taft Broad. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

### III.

Section 1983 provides in relevant part the following:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. A *prima facie* case under Section 1983 requires (1) conduct by an individual acting under color of state law, and (2) this conduct must deprive the plaintiff of rights secured by the Constitution or laws of the United States. *Day v. Wayne Cty. Bd. of Auditors*, 749 F.2d 1199, 1202 (6th Cir. 1984) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). Section 1983 merely provides a vehicle for enforcing individual rights found elsewhere and does not of itself establish any substantive rights. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002). Plaintiffs specifically assert that Defendants violated the Fourth Amendment's prohibition on excessive force and the First Amendment's right to speak, protest, and assemble. (Third Am. Compl., ¶¶ 86–87, 92–93.)

### A. Count I: Plaintiffs Allege Officers Masters and Thiel Violated the Fourth Amendment's Prohibition on the Use of Excessive Force

To analyze excessive force claims brought under Section 1983, courts must first identify the specific constitutional right that has allegedly been infringed. *See Graham v. Connor*, 490 U.S. 386 (1989). If the plaintiff was free when the incident occurred and the officer used force to arrest or seize the plaintiff, then the claim is analyzed under the Fourth Amendment's reasonableness standard. *Aldini v. Johnson*, 609 F.3d 858, 865 (6th Cir. 2010) (citation omitted). If the officer did not arrest or seize the plaintiff, then the claim will be analyzed under the

9

Fourteenth Amendment's substantive due process component. *Ciminillo v. Streicher*, 434 F.3d 461, 465 (6th Cir. 2006); *see also Dunigan v. Nobel*, 390 F.3d 486, 492 n.7 (6th Cir. 2004) ("Absent a seizure, an individual injured as a result of police misconduct may pursue a substantive due process claim."). "Thus, in determining whether to apply the Fourth or the Fourteenth Amendment to [the plaintiff's] excessive-force claim, the proper inquiry is whether [the plaintiff] was seized." *Id.* (citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 842–43 (1998)).

Plaintiffs and Defendants both move for summary judgment regarding Plaintiffs' claim that the individual defendant officers used excessive force against Plaintiffs. The parties disagree as to whether the officers "seized" Plaintiffs, as the Fourth Amendment employs the term.

### 1. Fourth Amendment Seizure

In the Fourth Amendment context, a person is seized when an officer, "by means of physical force or show of authority, terminates or restrains [the person's] movement through means intentionally applied." *United States v. Jones*, 673 F.3d 497, 501 (6th Cir. 2012) (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007)). A seizure can occur without actual physical restraint if, "in view of all circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1998) (internal quotation marks omitted). In addition, an individual must actually yield to the show of authority to be seized within the meaning of the Fourth Amendment. *Brendlin*, 551 U.S. at 254; *see United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010); *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (noting a seizure "requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority.") (emphasis in original).

For example, in *Ciminello v. Streicher*, a police officer shot the plaintiff with a beanbag propellent, told him to remain on the ground, and then instructed him to report to other officers

nearby. 434 F.3d 461, 463–64 (6th Cir. 2006). The Sixth Circuit found that the officers had seized the plaintiff and thus, the district court properly analyzed his excessive force claim under the Fourth Amendment. *Id.* at 466. The Sixth Circuit noted that the plaintiff was "the direct target of police conduct" and the type of force used indicated that the defendant "intended to stop [the plaintiff] from coming any closer." *Id.* at 465–66 (citing *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (noting that "the authorities could not 'seize' any person other than the one who was a deliberate object of their exertion of force")). The Sixth Circuit also noted that the fact "[t]hat [the plaintiff] was not eventually placed in handcuffs or taken to the police station does not preclude a determination that he was seized." *Id.* at 466; *see also Terry v. Ohio*, 392 U.S. 1, 16 (1967) ("It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime.").

In contrast, in *McKeown v. Hairston,* our sister district court found that when an officer moved a woman out of his way with physical force, he did not seize her. No. 05-73244, 2007 U.S. Dist. LEXIS 43490, at *9 (E.D. Mich. June 15, 2007). The court stated that "there [was] no evidence that an objective person in [the plaintiff's] position would have believed she was restrained, *i.e.,* she was not free to leave." *Id.* Distinguishing *Ciminillo*, the court noted that "the physical force was not accompanied by an effort to restrain or apprehend [the plaintiff.]" *Id.* at *8; *see also Ellsworth v. City of Lansing*, No. 99-1045, 2000 U.S. App. LEXIS 2049, at *5 (6th Cir. Feb. 10, 2000) (analyzing an excessive force claim under the Fourteenth Amendment when officers used tear gas to disperse a crowd of picketers blocking an entrance).

### a. Officer Thiel Seized Harrison Kallner

There is no genuine dispute of material fact that Officer Thiel seized Kallner when, after the initial deployment of pepper spray, he sprayed Kallner directly. Like the plaintiff in *Ciminillo*,

Kallner was the direct target of police conduct when Officer Thiel held out his hand and sprayed Kallner in the face. (Kallner Dep. 44:21–22; Thiel Dep. 119:3–8.) Like the officer in *Ciminillo*, Officer Thiel intentionally applied force and intended to restrain Kallner's movement by preventing him from traveling any further into the Intersection. A reasonable person in Kallner's position would not have felt free to move further into the Intersection. (Thiel Dep. 84:19–22; 87:2–4.) In this moment, the application of force terminated Kallner's movement and he was seized as the Fourth Amendment employs the term. (Kallner Dep. 49:22–50:19.)

### b. Officer Masters Seized Ellen Abdur-Rahim

There is no genuine dispute of material fact that Officer Masters seized Abdur-Rahim when, after the initial deployment of pepper spray, he sprayed Abdur-Rahim directly. Abdur-Rahim's seizure occurred in the same manner as Kallner's, and thus, the same analysis applies. Like in *Ciminillo*, the police directly targeted her, intentionally applied force to her, and restrained her movement any further into the Intersection. (Abdur-Rahim Dep. 75:19–76:17; Masters Dep. 188:14–18.) A reasonable person in Abdur-Rahim's position would not have felt free to move further into the Intersection. In this moment, Officer Masters terminated Abdur-Rahim's movement and she was seized as the Fourth Amendment employs the term.

Officers Masters and Thiel seized Plaintiffs, thus, the Court must next turn to whether these seizures were reasonable.

### 2. Reasonableness of the Seizures

In the Sixth Circuit, courts approach excessive force claims in segments. *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007). First, courts identify the seizure at issue. *Id.* Next, they examine whether the force used to affect that seizure was reasonable. *Id.* The Fourth Amendment prohibits the use of excessive force during the seizure of a free citizen. *Graham v.*

*Connor*, 490 U.S. 386, 394 (1989). Accordingly, even if an officer has probable cause to seize an individual, the officer must still employ a reasonable amount of force when effecting the seizure. *See id.* at 395.

When determining whether the use of force was "reasonable," courts balance the competing interests of the officers and the individuals. *Id.* "Three factors guide this balancing, 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (citing *Graham*, 490 U.S. at 388). These factors are important, but "are not the end of the matter, as the court must ultimately determine 'whether the totality of the circumstances justified a particular sort of seizure.'" *Id.* (citing *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005)). "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).

In the Sixth Circuit, the use of force on an incapacitated person is unreasonable. *Adams v. Metiva*, 31 F.3d 375, 378 (6th Cir. 1994). In *Adams v. Metiva*, the Sixth Circuit denied qualified immunity to an officer who sprayed mace in a suspect's face twice: first after the suspect walked away from the officer during a car stop; and then again, after the suspect got back in his car and refused to exit. *Id.* at 380. Addressing the second use of mace, the *Adams* court held that "spraying mace on a blinded and incapacitated person sitting in a car" violated the individual's right to be free from excessive force. *Id.* at 387.

Similarly, in *Champion v. Outlook Nashville, Inc.*, the Sixth Circuit found officers used unreasonable force when they pepper sprayed a man who was handcuffed and hobbled,[2] and thus, incapacitated. 380 F.3d 398, 903 (6th Cir. 2004). The Sixth Circuit relied on *Adams*, finding the use of pepper spray excessive force because the plaintiff was already incapacitated. *Id.*

In the Sixth Circuit, the use of force on a person who is not under arrest or resisting arrest is also unreasonable. *Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009). In *Grawey v. Drury*, the Sixth Circuit held "[a]n officer has used excessive force when he pepper sprays a suspect who has not been told she is under arrest and is not resisting arrest." *Id.* The use of pepper spray on a plaintiff who had stopped running, placed his hands against a wall, and was not aware he was under arrest, was unreasonable.[3] *Id.* at 314; *see also Atkins v. Twp. of Flint*, 94 F. App'x 342, 349 (6th Cir. 2004) (finding an unreasonable use of force when an officer pepper sprayed an arrestee without telling him he was under arrest, why is was under arrest, or that what he did was a crime).

Additionally, the Sixth Circuit has specifically limited the use of pepper spray as a method of force. The Sixth Circuit stated that "there is a very limited class of circumstances when the use of pepper spray is proper, including when the detainee is unsecured, acting violently, and posing a threat to himself or others." *Cabaniss v. City of Riverside*, 231 F. App'x 407, 413 (6th Cir. 2007). In *Cabaniss*, the plaintiff was unsecured in the backseat of a cop car and repeatedly smashing his head against the glass barrier. *Id.* The officer pepper sprayed the plaintiff. *Id.* This use of pepper spray was reasonable because the plaintiff posed a threat to his own safety, as well as the safety of others. *Id.*

---

[2] The Sixth Circuit noted "hobbled" is restraining an individual through a "'hobble device,' which essentially binds an individual's ankles together." *Champion*, 380 F.3d at 897.

[3] The Sixth Circuit also weighed the three *Graham* factors, noting the crime of disturbing the peace is minor, there was a minimal threat to officers since the plaintiff was unarmed, and the plaintiff was not resisting arrest or attempting to flee. 567 F.3d at 311. All the *Graham* factors weighed in favor of finding an unreasonable use of force.

In addition to the limited class of circumstances proscribed by the Sixth Circuit, our sister district has also approved of the use of pepper spray to quell a crowd. *Allen v. City of Toledo*, No. 3:09-CV-366, 2011 WL 3875376 (N.D. Ohio Sept. 1, 2011). In Allen, the Northern District of Ohio found that "a dangerous exigency justified the use of pepper spray to quell the crowd." *Id.* The court noted the police used the pepper spray "in a good faith effort to restore discipline and order." *Id.* at *21.

Plaintiffs argue Officers Masters' and Thiel's use of pepper spray was unreasonable because Plaintiffs were incapacitated from the initial deployment of pepper spray and plaintiffs were complying with orders to leave the Intersection. (Pls.' Mot. Partial Summ. J. at 12.) Plaintiffs also argue the *Graham* factors all weigh in favor of finding this use of force was unreasonable given the circumstances. (*Id.* at 14–17.)

Defendants argue the use of pepper spray was not excessive because a reasonable officer would not have believed Plaintiffs were complying with orders to leave the Intersection or that they were incapable of doing so because they were incapacitated. (Defs.' Resp. Pls.' Summ J. at 22, ECF No. 70, hereinafter "Defs.' Resp.")

Defendants also argue that because this case does not involve detention or arrest, it "presents an atypical factual scenario where the objective reasonableness of the officer's actions cannot be adequately assessed based on the three standard *Graham* factors." (*Id.* at 19.) Instead, Defendants argue, the Court should look at the totality of the circumstances. (*Id.*) The Court agrees.

### a. The Use of Pepper Spray on Harrison Kallner was Reasonable

Kallner fails to explain how he, from a reasonable officer's perspective, had submitted and was not resisting police orders. Based on the undisputed evidence, Kallner's actions indicate a

15

reasonable officer would conclude the opposite occurred. Kallner had not been in the Intersection upon the first deployment of pepper spray, but then ran directly into the Intersection once it began. (Kallner Dep. 71:5–11.) To a reasonable officer, Kallner appeared to be resisting and actively defying the dispersal orders. A reasonable officer could also conclude Kallner was not incapacitated, for he had the ability to move into the Intersection. Further, Kallner approached Officer Thiel and—due to anger and confusion—asked "why are you fucking spraying us?" (Kallner Dep. 44:19–20.) From a reasonable officer's perspective, this statement portrays possible aggressive tendencies.

Kallner asserts the Court should use the *Graham* factors. He argues this shows the force was unreasonable because he was not under arrest, not a danger to others, and not attempting to flee. The Court believes, however, that under the totality of the circumstances, Kallner's actions could lead a reasonable officer in that moment to believe Kallner was a danger to others.

Thus, from Officer Thiel's perspective, there was a protestor in the Intersection who had not been affected by the initial deployment of pepper spray, was defying police dispersal orders, and was portraying aggressive tendencies in a close vicinity. For those reasons, there is no genuine dispute of material fact that Officer Thiel's use of pepper spray on Kallner was reasonable under these circumstances. Accordingly, regarding Kallner's excessive force claim against Officer Thiel, the Court grants Defendants' motion and denies Plaintiffs' motion.

### b. There Is a Genuine Dispute of Material Fact as to Whether the Use of Pepper Spray on Abdur-Rahim was Reasonable

It is unclear whether a reasonable officer would conclude Abdur-Rahim was complying with the orders to clear the street. Abdur-Rahim testified that she was running away toward the Statehouse. (Abdur-Rahim Dep. 75:19–23, 98:9–11 ("I was running away from the area to try and cover and protect myself.").) She testified she "was dispersing" and "leaving the area." (*Id.* at

90:18–20.) Officer Masters, however, testified he walked up to her because she was not moving, and when he pushed her, she still did not move; and so, he sprayed her. (Masters Dep. 188:8–11.) The video evidence provides little help because Abdur-Rahim appears to be moving, but very slowly. (Defs,' Mot. Summ. J., Ex. C.) The video does not clearly illustrate Abdur-Rahim was complying with the order to disperse. Therefore, the Court cannot determine whether Officer Masters was reasonable for spraying her as if she was not.

Similarly, it is unclear whether that initial deployment of pepper spray affected Abdur-Rahim such that she was incapacitated. According to her testimony, she was "subjected to the haze of [] mace coming down" from the initial deployment because she was in the front. (Abdur-Rahim Dep. 102:23–24.) She testified it caused her to feel faint. (*Id.* at 76:4.) But she also testified that her hijab covered her face and that she was able to turn and run away. (*Id.* at 104:9–24.) The video and photograph evidence provide little help. In each video and photo that record the first deployment of mace, Abdur-Rahim is behind a large banner that protestors held directly in front of police. (Defs.' Mot. Summ. J., Ex. C, U, T; Pls.' Mot. Partial Summ. J., Ex. 1, ECF No. 64-6.)

Abdur-Rahim also argues the *Graham* factors suggest the force excessive because she was not arrested, not dangerous, and not attempting to flee arrest. That might be true. But, despite this, the genuine disputes over material facts show it is not clear whether a reasonable officer could have concluded this use of force was needed to ensure Abdur-Rahim moved out of the Intersection.[4]

---

[4] This case is not like *Allen v. City of Toledo*, where the Northern District of Ohio found the use of pepper spray to disburse a crowd reasonable because plaintiffs are not contesting the initial disbursement to move protestors out of the intersection. No. 3:09 CV 366, 2011 WL 3875376 (N.D. Ohio Sep. 1, 2011). Plaintiffs are contesting the subsequent sprays targeting Plaintiffs individually which were not in dispute in *Allen.*

17

### 3. Qualified Immunity

Defendants have raised the defense of qualified immunity. (Defs.' Resp. at 8; Defs.' Mot. Summ. J. at 29.) Government officials, such as the Columbus Division of Police officers in this case, "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

An official sued under Section 1983 is entitled to qualified immunity unless the plaintiff shows that the official violated a statutory or constitutional right that was "clearly established" at the time of the challenged conduct. *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014). Thus, in assessing qualified immunity, a Court must determine whether: (1) a violation of a constitutional right has occurred; and (2) the constitutional right at issue was clearly established at the time of the official's alleged misconduct.[5] *Grawey*, 567 F.3d at 309. "[W]hether qualified immunity is applicable to an official's actions is a question of law." *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996). "However, where the legal questions of qualified immunity turn upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Pouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir. 200) (internal quotations omitted). Thus, to the extent that there is a disagreement about the facts, the evidence must be reviewed in the light most favorable to the plaintiff. *Champion*, 380 F.3d at 900.

---

[5] Some Sixth Circuit panels have applied a third step that requires determining whether the plaintiff has established that official's action was objectively unreasonable in light of the clearly established constitutional right. *See, e.g., Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003); *Sample v. Bailey*, 409 F.3d 689, 696 (6th Cir. 2005). "In excessive force cases, however, because the defendant's conduct must have been objectively unreasonable to find a constitutional violation . . . the third step is redundant." *Grawey*, 567 F.3d at 309 (citation omitted). Therefore, qualified immunity in excessive force cases is a two-step analysis. *Id.*

Defendants have raised the qualified immunity defense and, thus, it is now Plaintiffs' burden to establish, first, that Defendants violated a constitutional right and, second, that the right was clearly established at the time the challenged conduct took place. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). This Court has "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### a. Plaintiffs Have Established Officer Masters Violated Abdur-Rahim's Fourth Amendment Right for Purposes of Qualified Immunity

Plaintiffs argue that Defendants violated the Fourth Amendment's prohibition on excessive force. This Court already decided that there is no genuine dispute of material fact that Officer Thiel did not violate Kallner's constitutional right to be free from excessive force. *See infra* Section III.A.2.a. Defendant's Motion for Summary Judgment is, thus, granted on this claim and the Court need not consider Defendants' claim of qualified immunity as to this alleged violation.

The Court also found that there is a genuine dispute of material fact as to whether Officer Masters violated Abdur-Rahim's right to be free from excessive force. *See infra* Section III.A.2.b. If the Court takes the facts in the light most favorable to Plaintiffs, the first deployment of pepper spray incapacitated Abdur-Rahim and she was following orders to move out of the street. (Abdur-Rahim Dep. 90:18–22; 102:23–103:8.) In this case, Officer Masters violated Abdur-Rahim's right to be free from excessive force when he used pepper spray on an incapacitated person complying with police orders. *See Adams*, 31 F.3d at 387; *Champion*, 380 F.3d at 903; *Grawey,* 567 F.3d at 314. The Court, thus, must determine whether Abdur-Rahim's right was clearly established.

### b. Abdur-Rahim's Right to Be Free from Excessive Force Was Clearly Established

In the context of qualified immunity, for a right to be clearly established "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Roell v. Hamilton Cty*, 870 F.3d 471, 483 (6th Cir. 2017).

Plaintiffs argue that Officer Masters is not entitled to qualified immunity because he violated Abdur-Rahim's clearly established right to be free from excessive force. Plaintiffs provide the violated right was clearly established because "[the Sixth Circuit] has repeatedly—and specifically—held that police use of pepper spray on a compliant, nonviolent individual is unconstitutional excessive force." (Pls.' Resp. Defs.' Mot. Summ. J. at 6, ECF No. 69, hereinafter "Pls.' Resp." (citing *Adams*, 31 F.3d at 385; *Atkins*, 95 F. App'x at 349; *Grawey*, 567 F.3d at 311).)

Defendants, however, define the issue more narrowly, stating:

> [The question is whether] it is a *per se* violation of the Fourth Amendment for an officer to use pepper spray to disperse demonstrators who are protesting in the middle of an intersection and illegally obstructing traffic, where those demonstrators have been repeatedly advised they were in violation of the law, subject to arrest, and subject to the use of chemical agents if they did not get out of the intersection.

(Defs.' Reply Pls.' Resp. at 7, ECF No. 72, hereinafter "Defs.' Reply.")

Defendants define the law too narrowly. "There need not be a case with the exact same fact pattern, or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional." *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Sixth Circuit precedent gave Defendants notice that "the right to be free from physical force when one is not resisting the police is a clearly established right." *Wysong v. City of Heath*, 260 F. App.'x 848, 856 (6th Cir. 2008); *see also Goodwin v. City of Painsville*, 781 F.3d 314, 329

(6th Cir. 2015) (holding the plaintiff had a clearly established right not to have force used on him when he was, at most, offering passive resistance); *Cannon v. Licking Cty.*, No. 2:17-cv-004, 2019 U.S. Dist. LEXIS 103911, at \*35 (S.D. Ohio June 21, 2019) (finding the officers were on notice that using gratuitous force is excessive"). Additionally, Defendants were on notice that the use of force after mace has incapacitated a suspect is excessive as a matter of law. *Adams*, 31 F.3d at 386; *see also Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681, 687 (6th Cir. 2006) (finding it clearly established that the use of force against someone who, due to being sprayed with mace, is "helpless and incapacitated" is an unconstitutional application of force); *Champion*, 380 F.3d at 901 (finding it clearly established that using pepper spray on someone who was already subdued through handcuffs and a hobble is excessive force); *Grawey*, 567 F.3d at 314 (finding it clearly established that "officers cannot use force . . . on a detainee who has been subdued, is not told he is under arrest, or is not resisting arrest.").

On January 30, 2017, Officer Masters was on notice that it is unconstitutional to pepper spray someone who is complying, not resisting, and is incapacitated from a deployment of mace. Thus, if the factfinder determines that Abdur-Rahim was not resisting and was instead complying with the orders to clear the street or was incapacitated from the initial deployment of mace, then it was clearly established that the subsequent use of force, another spray of mace, was unconstitutional. Officer Masters request for summary judgment is not warranted on Abdur-Rahim's excessive force claim because she has provided sufficient evidence of a violation of her clearly established right to be free from excessive force. *See Shreve*, 453 F.3d at 684.

In sum, Plaintiffs' Motion for Partial Summary Judgment on the claim that Officer Thiel violated the Fourth Amendment is denied. Defendants' Motion for Summary judgment on the same claim is granted. Plaintiffs' Motion for Partial Summary Judgment and Defendants' Motion

for Summary Judgment as to Plaintiffs' claim that Officer Masters violated the Fourth Amendment are denied. Defendants' Motion for Summary Judgment as to Officers' Thiel and Masters qualified immunity is denied.

## B. Count II: Plaintiffs Allege Officers Masters and Thiel Retaliated Against Plaintiffs for Exercising Their First Amendment Rights of Speech and Assembly

To establish a First Amendment retaliation claim, Plaintiffs must prove the following elements:

(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). Defendants move for summary judgement on Plaintiffs' claim that Officers Masters and Thiel used retaliatory force against Plaintiffs for the exercise of their First Amendment rights. Defendants argue Plaintiffs have not introduced evidence sufficient to create a genuine dispute of material fact as to the first and third elements required to prove a First Amendment retaliation claim.

### 1. First Amendment Protected Conduct

The Supreme Court has addressed "the right of a State or municipality to regulate the use of city streets and other facilities to assure the safety and convenience of the people in their use and the concomitant right of the people of free speech and assembly." *Cox v. Louisiana*, 379 U.S. 536, 554 (1965). In addressing this issue, the Supreme Court stated:

The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group [in] any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure

22

> this necessary order. . . . Governmental authorities have the duty and responsibility
> to keep their streets open and available for movement.

*Id.* Thus, it is clear that while freedom of speech "is the matrix, the indispensable condition, of nearly every other form of freedom," it "must be balanced against the state's responsibility to protect other important rights." *Springola v. Vill. of Granville*, 39 F. App'x 978, 982 (6th Cir. 2002) (citing *Palko v. Connecticut*, 302 U.S. 319, 327 (1937)).

In *Ellsworth v. City of Lansing*, picketers were blocking an entrance to private property in violation of a local city ordinance. 2000 U.S. App. LEXIS 2049 at *3. The Sixth Circuit affirmed the district court's grant of summary judgment to the defendants and stated "if the restrictions on picketing in paths of ingress and egress [were] constitutional, the picketers had no First Amendment right to block the gate." *Id.* at *8. The picketers had not challenged the constitutionality of the laws and thus, the use of force to unblock the gate did not infringe on their First Amendment rights. *Id.*

Plaintiffs assert that "[p]eaceful protesting and assembly are fundamental constitutional activities protected by the First Amendment, and these were the rights Plaintiffs were exercising when Defendants used force against them." (Third Amend. Compl. ¶¶ 90–92.) Further, Plaintiffs assert that the fact that they also engaged in unprotected conduct at some point during the protest does not defeat the protected conduct element. (*See* Pls.' Resp. at 10 (citing *Barnes v. Wright*, 449 F.3d 709, 717 (6th Cir. 2006)).)

Defendants assert that Plaintiffs cannot establish the first element—that Plaintiffs engaged in protected conduct—because they were violating local law by standing in the Intersection and disobeying orders to disburse. *See* Columbus Code Ordinances § 2333.04. Relying on *Ellsworth v. City of Lansing*, No. 99-1045, 2000 U.S. App. LEXIS 2049 (6th Cir. Feb. 10, 2000), Defendants contend that Plaintiffs' demonstration in the street is not protected activity.

This case is similar to *Ellsworth*. The City of Columbus has an interest in, and a responsibility to, keep the public streets open and free of hazards. The City of Columbus Police Department expressed this interest in their Incident Action Plan for the night of the Rally for the 99%. (Defs.' Mot. Summ. J., Ex., 1 (stating "[t]he mission of the Columbus Division of Police is to provide a safe environment for those expressing their [First] Amendment rights, to maintain the safe flow of vehicular and pedestrian traffic, to prevent civil disorder, and to protect people and property").) Both Kallner and Abdur-Rahim were in the Intersection when Officers Masters and Thiel sprayed them with mace. (Kallner Dep. 45:3–11; Abdur-Rahim Dep. 104:9–105:6; Masters Dep. 127:5–8.) Plaintiffs were in a street that the public has access to and vehicular traffic was blocked. (Lipp Aff. at ¶ 22.) They were instructed to move but did not. (Masters Dep. 151:7–24; Abdur-Rahim Dep. 66:1–18.) Thus, both Kallner and Abdur-Rahim violated Columbus Code of Ordinances Section 2333.04 by obstructing the right of way.[6] Plaintiffs had no constitutional right to obstruct access to the road in violation of the ordinance. *See Elsworth*, 2000 U.S. App. LEXIS 2049 at *8. Therefore, there is no genuine dispute of material fact that they were not engaged in protected conduct at the time of the alleged retaliation.

"Absent protected conduct, plaintiffs cannot establish a constitutional violation." *Thaddeus-X*, 175 F.3d at 395. The Court, thus, need not address the other elements for retaliation or qualified immunity. Defendants' Motion for Summary Judgment as to Plaintiffs' claim that Officers Masters and Thiel violated Plaintiffs' First Amendment rights is granted.

---

[6] Columbus Code of Ordinances makes it an offense to "[o]bstruct a highway [or] street . . . to which the public or substantial group of the public has access," and to "[d]isobey[] a reasonable request or order to move issued by a person the actor knows to be or is informed is, a peace officer or a person with authority to control the use of the premise when the request/order is made." Columbus Code of Ordinances § 2333.04(A)(1)–(2). "Obstruct" means "to render impassable or render passage unreasonably inconvenient or hazardous." *Id.* at § 2333.04(B). This offense is a misdemeanor of the Fourth degree. *Id.* at § 2333.04(C).

**C. Count III: Plaintiffs Allege Officers Masters and Thiel Assaulted and Battered Plaintiffs Violating Ohio Law**

Under Ohio law, political subdivisions and employees of political subdivisions are immune from actions to recover damages for injuries allegedly caused by any act or omission in connection with a government or propriety function. OHIO REV. CODE § 2744.03(A)(6). But there are exceptions. *Id.* The parties agree that the question of whether immunity applies in this instance arises under the exception in Ohio Revised Code Section 2744.03(A)(6)(b), which bars immunity if "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." OHIO REV. CODE § 2744.03(A)(6)(B).

"'Malice' is the willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified." *Wright v. City of Canton*, 138 F. Supp. 2d 955, 967 n.8 (N.D. Ohio Apr. 9, 2001) (citing *Cook v. City of Cincinnati*, 658 N.E.2d 814, 821 (Ohio Ct. App. 1995)). "'Bad faith' includes a dishonest purpose, conscious wrongdoing, or breach of a known duty through some ulterior motive." *Id.* (citing *Cook*, 658 N.E.2d at 821). "'Wanton' misconduct refers to one's failure to exercise any care whatsoever." *Id.* (citing *Fabrey v. McDonald Vill. Police Dep't*, 639 N.E.2d 31, 35 (Ohio 1994)). "'Reckless" refers to conduct that causes an unreasonable risk of harm and is 'substantially' greater than that which is necessary to make his conduct negligent." *Id.* (quoting *Thompson v. McNeill*, 559 N.E.2d 705, 708 (Ohio 1990)). The Court must presume Defendants are entitled to immunity, and the plaintiff must produce sufficient evidence to rebut this presumption. *Cook*, 658 N.E.2d at 821.

The Sixth Circuit has provided that "evidence of 'gratuitous' force for purposes of an excessive force claim is 'sufficient to establish a genuine issue of material fact as to whether the defendant acted maliciously or in bad faith in striking and arresting [the plaintiff].'" *Folks v. Petitt*,

676 F. App'x 567, 572 (6th Cir. 2017) (citing *Baker v. City of Hamilton*, 471 F.3d 601, 610 (6th Cir. 2006)).

For example, in *Otero v. Wood*, this Court denied summary judgment to a defendant who fired a wooden baton round at a plaintiff who "was not threatening anyone or even acting illegally." 36 F. Supp. 2d 612, 629 (S.D. Ohio May 7, 2004). This Court decided that the "direct firing [of the] wooden baton round at [the plaintiff] could be found to constitute wanton, reckless, and/or malicious behavior." *Id.*

Similarly, in *Folks v. Petitt*, an officer pulled the plaintiff out of his car and slammed him against it, causing contusions on the plaintiff's face, neck, and head. 676 F. App'x at 572. The plaintiff was "not resisting and not dangerous." *Id.* The Sixth Circuit, affirming the district court's denial of the defendant's motion for summary judgment, found the officer's use of force "gratuitous," and thus, "a reasonable juror could find that [the defendant] acted 'with malicious purpose, in bad faith, or in a wanton or reckless manner.'" *Id.* (citing OHIO REV. CODE § 2744.03(A)(6)(b)); *see also Canon*, 2019 U.S. Dist. LEXIS 103911 at *45 (finding a genuine issue of material fact as to the plaintiff's Ohio law assault and battery claims because it had already been found that there was a genuine dispute of material fact as to whether the use of force was gratuitous").

In contrast, when a plaintiff fails to demonstrate that an officer acted unreasonably under the Fourth Amendment, the plaintiff has similarly failed to show that the officer acted with malicious purpose, bad faith, or in a wanton or reckless manner. *Chappell v. City of Cleveland*, 585 F.3d 901, 916 n.3 (6th Cir. 2009); *see also Burdine v. Sandusky Cty.*, 524 F. App'x 164, 171 (6th Cir. 2013) ("Therefore, because the officers in this case acted reasonably under the Fourth Amendment, they are entitled to statutory immunity under Ohio law because they did not act . . .

with malicious purpose, in bad faith, or in a wanton or reckless manner."); *Pollard v. City of Columbus*, 780 F.3d 395, 404 (6th Cir. 2015.) (affirming the district court's grant of immunity to the officers and noting "[i]f the officers were objectively reasonable in shooting [the plaintiff], it logically follows that they could not have been reckless in shooting [the plaintiff]"); *Bard v. Brown Cty*, No. 13-4142, 2019 U.S. Dist. LEXIS 23122, at *56–57 (S.D. Ohio Feb. 13, 2019) ("Federal courts generally find [an Ohio Law assault and battery claim] rises or falls with a federal excessive force claim.").

Plaintiffs and Defendants both move for summary judgment on the issue of Plaintiffs' assault and battery claim. Plaintiffs argue that Defendants gratuitously sprayed mace directly at them while they were incapacitated, and this proves assault and battery under Ohio law. (Pls.' Mot. Partial Summ. J. at 17.) Defendants argue that the officers' actions were objectively reasonable, thus, "no rational trier of fact could conclude [Defendants] acted wantonly, or recklessly, let alone maliciously." (Defs.' Mot. Summ. J. at 24.)

### 1. Officer Thiel Is Immune from Liability for Spraying Kallner

There is no genuine dispute of material fact that Defendant Thiel acted objectively reasonable in using pepper spray on Kallner. *See infra* Section III.A.2.a. Plaintiffs failed to show a reasonable jury could find Officer Thiel acted unreasonably under the Fourth Amendment; thus, Plaintiffs have also failed to show a reasonable jury could find Officer Thiel acted with malicious purpose, bad faith, or in a wanton or reckless manner as required to overcome the presumption that Officer Thiel has immunity under Ohio law. *See Chappel*, 585 F.3d at 916 n.3. Defendants' Motion for Summary Judgment on Plaintiffs' claim that Officer Thiel assaulted and battered Kallner is granted, and Plaintiffs' Motion for Partial Summary Judgment on the same claim is denied.

2. **There Is A Dispute of Material Fact as to Whether Officer Masters Is Immune from Liability for Pepper Spraying Abdur-Rahim**

Plaintiffs have provided sufficient evidence such that there is a genuine dispute of material fact as to whether Officer Masters acted unreasonably in pepper spraying Abdur-Rahim. *See infra* Section III.A.2.b. Under the circumstances, if Abdur-Rahim was incapacitated and/or complying with orders to clear the Intersection, then directly using pepper spray on Abdur-Rahim might have been gratuitous and thus could be found to constitute wanton, reckless, or malicious behavior, or an act in bad-faith. *See Folks*, 676 F. App'x at 572; *Baker*, 471 F.3d at 610. Plaintiff has created a genuine issue of material fact as to whether Officer Masters has immunity under Ohio law. Thus, both Plaintiffs' and Defendants' motions for summary judgment as to Officer Masters' liability to Abdur-Rahim for assault and battery are denied.

D. **Count I and II: Plaintiffs Allege Lieutenant Lipp, Interim Chief Quinlan and the City of Columbus Violated Plaintiffs Fourth and First Amendment Rights**

A municipality cannot be held liable under Section 1983 on the basis of *respondeat superior*. *Thomas v. City of Chattanooga*, 398 F.3d 426, 432–33 (6th Cir. 2005) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)). A plaintiff cannot prevail against a municipality where none of the individual officers has violated the plaintiff's constitutional rights. *Bowman v. Corrs. Corp.*, 350 F.3d 537, 545 (6th Cir. 2003) ("[T]he district court held that without a constitutional violation of [the plaintiff's constitutional right] by [the individual defendants, the municipality] cannot be held liable for its policy, even if it were to encourage deliberate indifference. We agree."); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.") (emphasis in original).

Under Section 1983, a municipality can only be held liable if the plaintiff demonstrates that the alleged federal violation was a direct result of the city's official policy or custom. *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell*, 436 U.S. at 693). Plaintiffs can hold a city liable under Section 1983 by demonstrating: (1) an illegal official policy or legislative enactment; (2) an official with final decision-making authority ratified illegal actions; (3) a policy of inadequate police training or supervision; or (4) a custom of, tolerance for, or acquiescence in federal rights violations. *Burgess*, 735 F.3d at 478.

Defendants move for summary judgment on both of Plaintiffs' municipal liability claims. Plaintiffs assert that the City, Lieutenant Lipp, and Interim Chief Quinlan[7] have violated Plaintiffs' Fourth Amendment rights through their "policies and practices in ordering, directing, approving, and failing to prevent the unlawful use of force, and failing to train, failing to supervise, and failing to discipline their officers." (Third Am. Compl. ¶ 87.) Plaintiffs assert the City has violated their First Amendment rights through their "policies and practices in ordering, directing, approving, and failing to prevent the retaliatory use of force, and failing to train, failing to supervise, and failing to discipline their officers." (*Id.* at ¶ 93.)

## 1. The City's Liability for Violation of Plaintiffs' Fourth Amendment Rights

Plaintiffs argue they have presented evidence sufficient to prove multiple theories of municipal liability, including inadequate training and supervision and a custom of inaction. (Pls.' Resp. at 15, 20.) The Court has already found that Plaintiffs' claim that Officer Thiel violated Kallner's Fourth Amendment rights fails as a matter of law. *See infra* Section III.A.2.a. Kallner,

---

[7] Plaintiffs sue Lieutenant Lipp and Interim Chief Quinlan in their official capacities. Because "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity," the claims against Lieutenant. Lipp and Interim Chief Quinlan will be treated the same as the claims against the City. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

thus, cannot prevail on a claim against the City for violation of his Fourth Amendment rights. *See Bowman*, 350 F.3d at 545; *Heller*, 475 U.S. at 799.

The Court also held that a reasonable jury could find that Officer Masters violated Abdur-Rahim's Fourth Amendment right. *See infra* Section III.A.2.b. The Court therefore turns to the question of whether a reasonable jury could find the City was the moving force behind the alleged constitutional injury to Abdur-Rahim.

### a. Plaintiffs' First Theory of Liability: Failure to Train and Supervise

In order for a plaintiff to succeed on a failure to train or supervise claim, "the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused by the injury." *See Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

Defendants argue that the City's training and supervision was not inadequate. (Defs.' Mot. Summ. J. at 34.) The City's policy required police officers to be trained on the use of mace each year. (Lipp Aff. Ex. 2, at 1.) Further, officers had to demonstrate proficiency in the use of mace before being allowed to carry and use it. (*Id.*) Officer Masters testified he did indeed receive this training both during the police academy and yearly thereafter. (Masters Dep. 85:14–86:12.) Officer Masters also received training on the use of mace during officer bicycle training. (*Id.* at 88:13–17.) Officer Thiel also testified that he received this training both in the police academy and yearly. (Theil Dep. 42:4–43:24.) Additionally, the Columbus Police Emergency Operations Manual instructs officers on how to interact with demonstrators who are peacefully and lawfully demonstrating. (Lipp Aff. Ex. 4, at 1–4.)

Plaintiffs agree that the City maintains these written policies and trains officers on them. (Pls.' Resp. at 15.) Plaintiffs provide no evidence to create a genuine dispute of material fact as to the adequacy of Defendant's training, that the City's deliberate indifference caused such inadequacy, or that the inadequacy was closely related to the injury. Thus, no reasonable jury could find that the City's training amounted to deliberate indifference to the rights of its inhabitants.

### b. Plaintiffs' Second Theory of Liability: A Custom of Inaction

In order for a plaintiff to succeed on a theory of "inaction" the plaintiff must show:

> (1) the existence of a clear and persistent pattern of [illegal activity]; (2) notice or constructive notice in the part of the [defendant]; (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the [defendant's] custom was the "moving force" or direct casual link in the constitutional deprivation.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). Similarly, "[i]n a failure to discipline context, it is appropriate to apply the deliberate indifference standard . . . to require a showing of a history of widespread abuse that has been ignored by the [c]ity." *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994).

"Contemporaneous or subsequent conduct cannot" be used to establish the existence of a clear and persistent pattern of illegal activity. *Connick v. Thompson*, 563 U.S. 51, 63 n.7 (2011). Contemporaneous or subsequent violations do not provide a municipality with notice and an opportunity to conform to constitutional dictates, which if not performed, constitute deliberate indifference. *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 395 (1989); *see also Ellis*, 455 F.3d at 701 n.5 ("We have not found any legal support for the proposition that, in the absence of deliberate indifference before a

31

constitutional violation, a municipality may be held liable for simply failing to investigate or punish a wrongdoer *after* the violation.") (emphasis in original).

Similarly, only one prior incident of illegal conduct is not sufficient. *See Thomas*, 398 F.3d at 433. "[A]ttempting to infer a municipal-wide policy based solely on one instance of potential misconduct" is a "path to municipal liability [that] has been forbidden by the Supreme Court," namely, respondeat superior. *Marsili v. Vill. of Dillonvale*, No. 2:12-cv-741, 2014 U.S. Dist. LEXIS 65831, at *62–63 (S.D. Ohio May 13, 2014); *Thomas*, 398 F.3d at 433 ("The danger in appellants' argument is that they are attempting to infer a municipal-wide policy based solely on one instance of potential misconduct. This argument, taken to its logical end, would result in the collapsing of the municipal liability standard into a simple respondeat superior standard . . .[which] has been forbidden by the Supreme Court."); *D'Ambrosio v. Marino*, 747 F.3d 378, 388 (6th Cir. 2014).

Plaintiffs, to satisfy the pattern requirement, put forth four occasions when the City's officers have used pepper spray against allegedly nonviolent individuals. (Pls.' Resp. at 16–18.) However, two of the incidents, the Pride Parade on June 17, 2017, and the #FreeMasonique Demonstration on May 4, 2019, occurred after the Rally for the 99%. These incidents may not be used to prove a pattern of events. *Connick*, 563 U.S. at 63 n.7. Similarly, one of the four incidents the Plaintiffs rely on is the incident in question on January 30, 2017, where officers allegedly sprayed other individuals besides Plaintiffs. This incident, occurring contemporaneously, cannot be used to prove a pattern of events. *Connick*, 563 U.S. at 63 n.7. None of these three events would have put the City on notice of a pattern of unconstitutional conduct prior to January 30, 2017.

Thus, Plaintiffs have only alleged one prior event, the 614 Equality March on October 23, 2016, to establish a pattern of illegal conduct. One prior instance does not put a municipality on notice and cause its inaction to be deliberate indifference. *See Marsili*, 2014 U.S. Dist. LEXIS 65831 at *62–63; *Thomas*, 398 F.3d at 433; *D'Ambrosio*, 747 F.3d at 388. Thus, no reasonable jury could find that the City has a custom of inaction for there is no genuine dispute of fact that there was not a pattern of prior illegal conduct.

## 2. The City's Liability for Violation of Plaintiffs' First Amendment Rights

The Court has already found Plaintiffs' claims that the individual officers violated Plaintiffs' First Amendment rights fail as a matter of law. *See infra* Section III.B.1. Plaintiffs, thus, cannot prevail on a claim against the City for violation of their First Amendment rights. *See Bowman*, 350 F.3d at 545; *Heller*, 475 U.S. at 799.

In sum, Defendants' Motion for Summary Judgment as to the City's liability under both the Fourth and First Amendment, is granted.

## IV.

For the reasons stated above, the Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment (ECF No. 64) and **GRANTS in PART and DENIES in PART** Defendants' Motion for Summary Judgment (ECF No. 63).

**IT IS SO ORDERED.**

_12–2–2019_
**DATE**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDG**